UNITED STATES of America, Plaintiff,

v.

Winston Stuart WESTON, Defendant.

No. CR–81–3.

United States District Court,
W. D. New York.

July 24, 1981.

---

Roger P. Williams, U. S. Atty., Buffalo, N.Y. (Carol E. Heckman, Cheryl S. Fisher, Asst. U. S. Attys., Buffalo, N.Y., of counsel), for plaintiff.

Alan R. Feuerstein, Buffalo, N.Y., for defendant.

CURTIN, Chief Judge.

Defendant Winston Weston is charged with bringing Poorshotam Moti, an illegal alien, across the Rainbow Bridge from Niagara Falls, Canada, to Niagara Falls, New York, in violation of 8 U.S.C. § 1324, 18 U.S.C. § 2, and 18 U.S.C. § 371. Defendant has moved to suppress certain evidence against him. A hearing on defendant's motion took place on March 20, 1981. The facts revealed at that hearing are as follows.

On December 21, 1980, at 1:30 a. m., a white male drove his car up to Immigration and Naturalization Inspection Station on the Rainbow Bridge. Immigration Inspector Barbara Hale was in the booth. As the car approached the inspector, she recorded the license number of the car on her "TEX" machine, as is the standard procedure. When the driver's window pulled parallel to Inspector Hale, the driver rolled down his window only between three inches and halfway. The inspector asked several routine questions, including where he had been in Canada, how long he had been there, and the reason for his trip. The inspector testified that the driver spoke softly and with a nervous stammer. She said she had to ask him to look at her when she asked questions. In addition, she said she had to bend down close to him, less than a foot separating their faces, to hear him. She also testified that she asked him to roll down the window. She said she was able to see him clearly because the area was well lit and her view unobstructed. Although most border interviews that night lasted only 30 seconds, this interview lasted 1½ to 2 minutes because the driver's stated purpose of his visit was atypical given the other traffic that night and because she thought the driver might have an accent.

As the inspector asked the driver to open the trunk, the vehicle began to roll forward, at first slowly, and then at much greater speed. The inspector shouted at the car as it began to drive off, but to no avail. She stated that she shouted because some people who are asked to open their trunks believe they should bring the trunk parallel to the inspection window or that they should immediately drive to the secondary inspection area. Her shouting was intended to avoid any misunderstanding. As the car sped away, the inspector again checked the license plate and took note that the vehicle was a brown Ford car. She immediately closed her booth and reported what had happened to her supervisor. The inspector also notified the Border Patrol and the New York State Park Police. The time was approximately 1:30 a. m.

A description of the vehicle was broadcast on various police radios, along with the information that the car had run through the border without completing inspection. Although it is not entirely clear, the broadcast evidently described the car as a brown Ford containing a single white male with dark hair, gave the license number, and stated that the incident had just occurred.

Border Patrol Agents John T. Attanasio and Thomas P. Haggerty took up a surveillance position in their car on the Grand Island Bridge, approximately four miles south of the Rainbow Bridge. There they waited from 1:40 a. m. until 3:05 a. m., at which time they returned to their station. Soon after returning to the station, the agents received word that the car had just

passed through the Williamsville toll barrier on the New York State Thruway, heading east toward Albany. They contacted the New York State Police and asked them to detain the vehicle until the agents could get there, which the State Police did. Just as the information came over the agents' car radio that the vehicle had been stopped, and as Agent Attanasio was requesting the location of the car, the agents crested a hill spotting the stopped car.

Two New York State Police officers were questioning the defendant at the rear of his car. The defendant was wearing handcuffs. Another individual, later identified as Poorshotam Moti, was still in the car. After checking that the license plate number matched that broadcast, the Border Patrol agents interviewed Moti. They opened the car door, asked him to step out, and asked him his citizenship. Agent Attanasio testified that Moti had an "East Indian" accent, medium dark skin, but claimed to have been born in Brooklyn, New York. Agent Attanasio responded by saying, "I don't believe you are from Brooklyn, New York." Mr. Moti was told to take a seat in the backseat of the Border Patrol cruiser. The two agents got in the front seat and advised Moti of his constitutional rights. Upon further questioning, Moti said he was from Guiana but was in the United States legally, had been hitchhiking, and had been picked up by the defendant.

Agent Attanasio next joined the two State Policemen and the defendant. By this time, they were seated in the other police car. Agent Attanasio testified that defendant, who was wearing handcuffs, was not free to leave. The agent got in the back seat with the defendant and questioned him as to where he was born, what his citizenship was, and where he had picked up Moti. The defendant replied that he picked him up hitchhiking on the Thruway. The agent responded by saying that he did not believe him inasmuch as Moti had admitted that he was from Guiana and had come into the country in the trunk of defendant's car. The latter, of course, was false. Defendant reportedly at that point confirmed that Moti had been in the trunk. The officer told the defendant that he was under arrest. Questioning ceased. After a short discussion between the Border Patrol agents and the State Police officers, the agents substituted their handcuffs on the defendant for those of the State Police, and both individuals were taken by the Border Patrol from Pembroke, where they were stopped, to their station in Tonawanda. They were asked not to speak to each other during the 45-minute drive back to the station in the backseat of the Border Patrol car.

Once at the station, they were taken to separate interview rooms. At approximately 5 a.m., soon after arrival, Agents Attanasio and Haggerty read the defendant his rights. The defendant reportedly said that he understood his rights, but he refused to sign a form to that effect.[1] Instead, he asked to call his wife and was allowed to do so. Thereafter, he reportedly agreed to talk with the agents. After some questioning, the defendant at 7 a.m. made a statement which was recorded on tape. After some further questioning, the defendant

---

1. I am troubled by the fact that at the preliminary hearing in sworn testimony before United States Magistrate Edmund F. Maxwell the Border Patrol agent repeatedly testified that the defendant had signed the waiver of rights form, only to recant this testimony at the suppression hearing. Transcript of Preliminary Hearing held on December 30, 1980, filed March 23, 1981, at 42. Compare Transcript of Hearing on Motion to Suppress held on March 20, 1981, filed on May 27, 1981, at 53–54, 68–70, and especially 80. That evidently false testimony was given to Magistrate Maxwell is shocking and causes the court to have concern as to the credibility of the agent's other testimony. It is this kind of false testimony which, because it can so easily be detected, smacks of more than mere carelessness. In order to preserve the integrity of the preliminary hearing and trial process, it is essential that agents tell the truth when under oath. It is particularly important that the Assistant United States Attorneys impress upon their witnesses their duty in this regard and investigate the testimony on their own in advance of a court hearing. Whether defendant signed the waiver form is precisely the kind of matter which could have been checked easily in preparing the witness to take the stand.

made a second taped statement, beginning at 8:55 a.m. This one mentions that Lomas Sharma, the defendant's brother-in-law, arranged for Moti to travel with the defendant. The tape ran out before defendant completed his second statement, and a written report was prepared. It was signed by defendant, and both agents witnessed his signature. The court has listened to both tapes.

In short, the substance of the statement makes clear that defendant admitted having picked up Moti in Toronto by prearrangement and having transported him to the bridge. When they approached the bridge, Moti got in the trunk. He admitted that Inspector Hale's order that the defendant open his trunk at the inspection station scared him, with the result that he sped off without completing the inspection.

In the course of the second statement, the written report reflects the following exchange took place:

Q. Do you wish to have a lawyer or any other person present to advise you?

A. Yes, my wife and my brother-in-law.

Q. Are you willing to answer my questions at this time? Without them being present?

A. Yes.

At no point was the defendant's wife, his brother-in-law, or a lawyer summoned in response to this request.

While the defendant was being interviewed at the station, the agents received a call from Inspector Hale who had finished her work shift at the Rainbow Bridge. She had heard police radio reports that they had "apprehended the vehicle," and wanted to know whether she should stop in at the Tonawanda Border Patrol Station on her way home to Lockport. She spoke with Agent Sebring who asked her to come to the station and who confirmed that the vehicle had been stopped and two suspects had been arrested. At 7:45 a. m., approximately six hours after the incident at the bridge, Inspector Hale was led to the interview room in which the defendant was being questioned by Agent Attanasio, who was known to Inspector Hale. Hale

stepped into the room for a few seconds. At the hearing she testified that she is trained to retain mental images of people and had no doubt that the defendant was indeed the driver of the car that she had stopped earlier that evening. She also testified that she is now unable to recall whether the individual on the bridge had a mustache or what clothes he wore.

The parties differ sharply as to the correct characterization of the events of that December morning. The government argues that the stop of the car was either part of an "extended border search" or a "*Terry* stop" based on articulatable suspicion. *Compare United States v. Moya,* 549 F.2d 340 (5th Cir. 1977), *with Terry v. Ohio,* 392 U.S. 1, 87 S.Ct. 2050, 18 L.Ed.2d 989 (1968). Under either theory, the stop of defendant's car by the State Police would be permissible. The roadside questions put to defendant would be permissible as well under either theory. The Border agents properly arrested defendant after his admission that Moti was in the trunk because only at that point did they have probable cause, argues the government. Subsequent questioning at the station house was proper because defendant waived his rights. The defendant's request for the presence of his relatives was purportedly ambiguous, not clearly indicating that he wished questioning to cease at that time. The subsequent question whether he was willing to answer further questions was, on this theory, permissible to clarify the defendant's intent. Finally, Inspector Hale's proposed in-court identification was allegedly based on her original Rainbow Bridge encounter with him, not on the subsequent interview room showup.

In sharp contrast, the defendant argues that from the time of the original stop of the defendant's car by the State Police, he was under arrest. The answers given in response to roadside questioning must be suppressed because no *Miranda* warnings were given. The plaintiff would also suppress the station house questioning on the grounds that there was no waiver of rights and that information gained was the result

of "compelling pressures." Defendant points to the fact that he refused to sign the waiver form and requested to see his wife and brother-in-law rather than answer questions. Finally, he also would suppress Inspector Hale's proposed in-court identification on the ground that the station house showup was impermissibly suggestive.

The many issues raised by this motion can best be addressed *seriatim*, as they occurred. It is clear from the positions of the parties that suppression of the statements made by defendant will turn on the characterization of the initial roadside stop by the State Police.

*Over the Rainbow*

█ Searches made at the border without probable cause or warrant are reasonable "simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1976). As a result, there can be no question but that the stop by Inspector Hale was permissible.

In addition, in recent years searches without probable cause or warrant which take place near but not at the border have been permitted both of people who have just come from the immediate border area, *United States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968), *cert. denied* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969) [public streets near the piers]; *United States v. McGlone*, 394 F.2d 75 (4th Cir. 1968) [paved quay near pier]; *United States v. Nieves*, 609 F.2d 642 (2d Cir. 1979) [within the airport but outside the customs area], as well as of people further distances away from the border under the so-called "extended border search doctrine." *United States v. Moya*, 549 F.2d 340 (5th Cir. 1977); *United States v. Bowman*, 502 F.2d 1215 (5th Cir. 1974). Stops of vehicles suspected of carrying illegal aliens near the border, as distinguished from searches of those cars, have been permitted under the more common *Terry*-stop analysis. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1974); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Of course, cars may always be stopped where the police have probable cause. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

██ In this case, the State Police properly stopped defendant's car because they had probable cause at the time of the stop. The information which the police, including the Border Patrol agents who had radioed for assistance, had was that a car bearing defendant's license plate number had run through the border inspection station approximately two hours earlier and that the inspection station was only a few miles from where the car was stopped. The car involved was a brown Ford, as defendant's car was. Defendant was driving east, away from the bridge. The defendant fit the description of the driver, a white male with dark hair. The coincidence of the license plate number, geographical location, description of the driver, and proximity in time of the run-through to the stop clearly constituted probable cause to stop the car.[2]

It is equally clear that after the State Police stopped defendant's car they arrested him, and that they did so properly. The point at which a person is under arrest must be determined by examining all of the surrounding facts and circumstances. *Ore v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1976). In our case, the relevant facts are as follows.

2. The only evidence to the contrary are the repeated statements in the record by police and the Immigration and Naturalization inspector that cars often run through the border because of misunderstandings. However, the facts must be viewed objectively. *United States v. Jackson*, 652 F.2d 244 (2d Cir. 1981). Moreover, the inspector shouted after the car precisely to avoid any misunderstanding. In addition, the car "sped" away, further indicating the driver was attempting to avoid apprehension. The inspector's shouts and the high velocity of the car were never communicated to the State Police or the Border Patrol. It may be, however, that these police officers can rely on Inspector Hale's knowledge. *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1970).

■ It was late at night, and defendant was stopped at an apparently isolated spot on the side of the road. Upon being stopped, the defendant was taken from the driver's seat to the rear of his car and handcuffed. The officers testified that he was not free to go. When the Border Patrol agents arrived, he was standing at the rear of the car with an armed State Policeman on either side of him. Their weapons were not drawn, but the officers directed defendant to take a seat in the rear of their State Police car. He remained there with the two uniformed State Policemen until joined by Border Patrol Agent Attanasio. He was not advised of his rights prior to questioning and was in an atmosphere which can only be described as coercive. Surrounded by police in the backseat of a police cruiser and handcuffed, he was without doubt under arrest at the time, if not earlier.[3]

■ Nor can the car-stop and roadside questioning be characterized as part of an extended border search. The defendant was handcuffed from the outset, the car-stop was two hours after the initial crossing, and the stop was several miles inland away from the border. In fact, the defendant's station house statements and the elapsed time relative to the short distance traveled lead to the conclusion that defendant did not travel directly from the bridge to where he was apprehended.[4] In addition, the extended border search doctrine cases as well as those cases recognizing that stops by the Border Patrol may be justified under circumstances less than those constituting probable cause for arrest or search all grow

out of the special circumstances of our Mexican border. The border with Canada touching on this judicial district is sharply defined, and detection of those who cross it is relatively easy. This is in marked contrast to the "open border" to our southeast.[5]

■ Having determined that defendant was in custody under arrest at the time that he was questioned, and there being no claim that defendant was told his constitutional rights, any statements made by defendant at the roadside must be suppressed. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Station House Questioning*

■ As a general rule, fruits of an officer's unlawful actions which are come at by exploitation of a "primary illegality" must also be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, where there is a subsequent statement which is so attenuated from the original illegality as to dissipate the taint, the later statement may be admitted. *Ibid.* at 491, 83 S.Ct. at 419. In determining whether a subsequent statement is sufficiently attenuated, no single fact is dispositive. Important factors include whether defendant was given *Miranda* warnings, temporal proximity of arrest to confession, and the presence of intervening circumstances. *Brown v. Illinois*, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416, 422 U.S. 590, 603–04 (1974).

■ In our case, the defendant was moved to a different situs for the subsequent questioning. He spent 45 minutes in

---

3. Although the issue was not raised, we attach no significance to the fact that State Officers effected the arrest and that the questioning took place while the defendant was in a State car wearing the State Officer's handcuffs. Of course, had the State Officers merely detained defendant for a reasonable period consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969), it is possible that the custodial interrogation would not have been deemed to have occurred until later in the questioning. However, in this case, the Federal handcuffs were quickly substituted for the State's, the State Officers acted at the request of the Federal Agents, and custody did change hands.

4. *See* Government's Exhibit 2 at question 20.

5. In *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), the United States Supreme Court emphasized the importance of the ease of crossing that border undetected.

> This case portrays at once both the enormous difficulties of patrolling a 2,000-mile open border and the patient skills needed by those charged with halting illegal entry into this country.

silence during the drive to the station house, thus constituting a clear and substantial mental demarcation between the two interviews. Once at the station he was read his *Miranda* rights and acknowledged that he understood them. The whole tenor of the station house questioning was more serious and focused, reflecting the Border Patrol agent's belief that defendant was now for the first time the object of a custodial interrogation. Also important, all of the first station house interview and part of the second was on tape. The court has listened to both tapes and concludes that the officers were persistent in their questioning but also polite, respectful of defendant, and anything but abusive or badgering. Finally, the first statement was not begun until 5 a. m. and the second not until almost 9 a. m., some six hours after the improper roadside questioning. The purpose of the station house questioning was clearly to discover facts, not overbear defendant's will. Under these circumstances, I find that the station house statements were sufficiently attenuated from the pre-warning roadside statement made hours earlier as to be admissible. *United States v. Toral*, 536 F.2d 893, 896 (9th Cir. 1976).

### Miranda

When a person in custody, in response to being given his *Miranda* warnings, requests the presence of an attorney or that questioning cease, as a general rule, the police must immediately stop the interview. *Miranda v. Arizona*, 384 U.S. at 444–45, 86 S.Ct. at 1612. However, when in response to being given his rights the defendant makes an ambiguous response, the officer may ask a supplemental question to clarify the defendant's intentions. *Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979), *cert. denied* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409; *United States v. Prestigiacomo*, 504 F.Supp. 681 (E.D.N.Y.1981).

The defendant here was asked whether he wanted to have a relative or an attorney present to advise him. Defendant's response was, "Yes, my wife and my brother-in-law." It must immediately be observed that in the wisdom of the law even a request for one's wife takes a backseat to a request for one's lawyer. *See Fare v. Michael C.*, 442 U.S. 707, 728, 99 S.Ct. 2560, 2573, 61 L.Ed.2d 197 (1978) (Marshall, J., dissenting). Simply stated, defendant had an absolute right to have his lawyer present, not his wife. *Chaney v. Wainright*, 561 F.2d 1129 (5th Cir. 1977) [mother]; *Lee v. Henderson*, 342 F.Supp. 561 (W.D.N.Y.1972) [father]; *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1978) [probation officer]. The defendant's reply was not an unequivocal demand that questioning cease until these relatives could be summoned. On the contrary, a fair-minded police officer would be in doubt whether defendant was willing to have questioning continue, wanted a lawyer, or wanted his relatives present at the time of questioning. The agent's follow-up question was permissible under these circumstances, and once the defendant stated he was willing to answer questions in their absence, he waived his right further to remain silent. This willingness to speak with the agents is further confirmed by other of defendant's statements later in the interview. Under the prevailing law, I am compelled to conclude that defendant waived his rights and that he did so voluntarily.

### Inspector's Showup

An in-court identification may not be based on an impermissibly suggestive showup. However, where the identification is based on an independent source, the showup may be found under the circumstances not to have been conducive to irreparable mistaken identification. *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1751, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Inspector Hale is trained to remember faces. She viewed the driver of the car for a relatively long time, 1½ to 2 minutes, in a good light, with her suspicions aroused. For much of the time her face was only one foot away from defendant's. The subsequent showup was much flagged and tainted. She clearly expected the man being questioned by Agent Attanasio alone in the interview room to be the driver she had

seen earlier that morning. On the other hand, the identification took place only a matter of hours later, and she identified him with certainty. I was impressed with the inspector's certainty of recollection on the witness stand and her general demeanor. I find that in light of all of these facts, the inspector's in-court identification of the defendant as the driver was not significantly affected by the tainted showup. Her testimony will not be suppressed.[6]

In conclusion, the statements made by defendant at the roadside to Agent Attanasio will be suppressed. All other statements and Inspector Hale's in-court identification will be admitted.

So ordered.

---

6. The Government does not intend to introduce at trial the inspector's identification of the defendant at the Border Patrol Station on December 21, 1980. Consequently, we need not address the admissibility of that identification directly.