**UNITED STATES of America, Appellee,**

v.

**Angelita GOTAY, a/k/a "Angie", Defendant-Appellant.**

**No. 788, Docket 87–1480.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1988.

Decided April 15, 1988.

James A. Cohen, New York City, Fordham University School of Law (Kevin Corriston, Bill Gianaris, Legal Interns, of counsel), for appellant.

Peter B. Sobol, New York City, Asst. U.S. Atty. for S.D. of New York (Rudolph W. Giuliani, U.S. Atty. for S.D. of New York, Celia Goldwag Barenholtz, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, PRATT, Circuit Judge and GLASSER, District Judge.[*]

[*] Honorable I. Leo Glasser, United States District Judge for the Eastern District of New York, sitting by designation.

FEINBERG, Chief Judge:

Angelita Gotay appeals from a judgment of conviction on five felony drug counts in the United States District Court for the Southern District of New York, following a jury trial before Miriam Goldman Cedarbaum, J. On appeal, Gotay argues that her post-arrest statements to the police should have been suppressed because her request for counsel was ignored. She also claims that her statements were involuntary and that the evidence was insufficient to support conviction on two distribution counts. For the reasons stated below, we reverse the decision of the district court on those two counts and affirm on the other three.

## I. Background

Viewing the evidence in the light most favorable to the government, as we must, we think that the jury could have found the following relevant facts.

On October 16, 1985, Drug Enforcement Administration (DEA) special agent Timothy Higgins drove to 880 Bryant Avenue in the Bronx, New York, with confidential informant Edward McCoy. McCoy met "Ralphie" outside and the two went into apartment 2A, Gotay's apartment. McCoy bought 55 envelopes of heroin from "Ralphie" and a "fat kid," neither of whom have been arrested. The envelopes were each stamped with a blue face, the logo of "Faces"-brand heroin.

On November 26, 1985, Higgins and McCoy returned to Gotay's apartment. Gotay opened the door, and said that Ralphie was not home and that Higgins and McCoy had come to the wrong apartment. The pair went down to the street, where they encountered Jose Aviles. Aviles told them "don't worry," explaining that Gotay was "being that way because she don't know." Aviles told Higgins that he worked for "Angie" and could get "Elegante" heroin from her right away. Aviles also introduced the pair to Pablo Marcano. Higgins gave Aviles $800, and Aviles instructed Marcano to "[g]o see Angie and

get the heroin." Shortly thereafter, Marcano returned with a total of 4.08 grams of heroin in envelopes stamped with the word "Elegante" and a picture of a red hat.

On December 4, 1985, Higgins and several other law enforcement officers entered Gotay's apartment with a search warrant. Gotay and one of her daughters blocked the hallway in order to prevent the agents from reaching the bedroom, and Higgins forced Gotay to the floor. In the bedroom, Gotay's son, Paul Joseph Viera, was throwing cash and glassine envelopes of heroin out a window. The agents searched the apartment, which appeared to them "like a little heroin mill," and discovered approximately 121 glassine envelopes of heroin stamped with a blue face, 425 heroin envelopes stamped with a red hat and the word "Elegante," 213 cocaine capsules and $3,910 in cash. More cash and drugs were found below the bedroom window. During the search, two men who the drug agents said looked like drug addicts knocked on the door and asked for Gotay.

After the narcotics had been collected, Higgins read Gotay her *Miranda* rights. Higgins then said "Are you willing to help us? ... [I]f you can help us, we can try and help you. Are you willing to talk with us or do you want the lawyer." Gotay answered, "No, no, I am very afraid. I don't want to talk in front of these people." Gotay and the others arrested were then transported to DEA headquarters.

At DEA headquarters, Agent John Tully again read Gotay her rights. She nodded her head several times during his reading and, at the end when Tully asked her whether she understood, said "Yes." Tully testified that she then "told me she couldn't afford a lawyer, that she was concerned about obtaining a lawyer." Tully responded with either "A court will appoint a lawyer" or with "the court will take care of that," and nothing else about counsel. "That's when I started asking her about the source of the heroin," he said. In response to questions, Gotay explained why she became a dealer, described her involvement in heroin dealing and offered to tell agents about other crack and heroin

operations. For example, Tully testified that Gotay "generally described" her suppliers, who "came periodically to drop off narcotics and pick up money.... She said she took the narcotics, sold it and gave them what she owed for it." Higgins added that she stated "that the heroin, the Elegante heroin ... was coming from individuals downtown." Gotay spent the night in custody.

The next day, December 5, 1985, Assistant United States Attorney Sobol interviewed Gotay. He read Gotay her rights, which she said she understood. On direct examination by the government during the suppression hearing, Higgins, who was at the interview, testified that Gotay said she didn't need to speak to an attorney at that time and that she would need one assigned. However, on cross Higgins testified "I think she said she needed—she said she needed an attorney ... She said she needed an attorney, that she wanted one appointed." Gotay's testimony about this meeting is somewhat fragmented, perhaps because she testified in English in which she is not perfectly fluent and perhaps because, as she says, her recall was hampered by confusion and mental overload related to her arrest. Gotay testified that "I tell him [Sobol] I can't pay for a lawyer. He know I can't.... I said, when you have to go to court you need an attorney. How can anyone defend themselves? ... He ask me I need a lawyer. I think I tell him yes." In response to a question from Sobol, Gotay testified that she never said "I don't want to answer any more questions. I want a lawyer now." During the interview, Gotay expressed willingness to cooperate with the government, gave what the government calls "detailed pedigree information," and acknowledged that she had been dealing in heroin and cocaine. For example, Higgins testified that Gotay said "that she had been selling heroin and cocaine for a few months."

Later on December 5, Gotay appeared before Magistrate Leonard A. Bernikow, who appointed counsel and set bail.

During January 1986, Gotay met with Tully and Higgins several times and gave

them information (some of it in writing) about other drug operations in the Hunt's Point area. She was paid $900 for expenses and information. We are told by the government that these meetings were held with the knowledge and consent of Gotay's lawyer, and Gotay does not contest the admissibility of these statements on appeal.

In September 1986, Gotay, Aviles, Marcano, Viera and others were indicted. Thereafter, Judge Cedarbaum held a pretrial suppression hearing focusing mainly on the admissibility of Gotay's December post-arrest statements. In June 1987, Judge Cedarbaum ruled from the bench that "[t]here is no evidence that the decision [to make statements] was the result of any physical or psychological coercion. Nor am I persuaded ... that Ms. Gotay made that decision without a full understanding of her constitutional rights both to remain silent and to seek legal assistance.... I am quite satisfied after listening to Ms. Gotay in English that she is, as she herself candidly admitted, familiar with the import of her *Miranda* rights and understood the warnings that were given to her." At defense counsel's request, the Court clarified its ruling a few days later, and stated that "I construed them [Gotay's comments about counsel] as not being requests for counsel.... I am satisfied that she understood how to ask for a lawyer if she wanted one, and I am satisfied when she wanted one and asked for one it was provided to her, that she understood that she had a right to do that."

Three of Gotay's co-defendants pled guilty, and Gotay and Viera went to trial in July 1987. As to Gotay, the judge dismissed a conspiracy count with the government's consent, and, at the close of the prosecution's case, granted a motion for acquittal on one of three distribution counts. The jury returned a guilty verdict against Gotay on the remaining two distribution counts relating to October 16 and November 26 and on three counts of possessing drugs on December 4 with intent to distribute (the possession counts).

In October 1987, Judge Cedarbaum sentenced Gotay to concurrent three-year terms of imprisonment, followed by three years of supervised release. Gotay is serving her sentence.

## II. Admissibility of the December Post–Arrest Statements

The legal principles governing post-arrest questioning are well settled. Before a custodial interrogation, suspects must be informed of their rights to remain silent and to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). These rights may be waived if the waiver is knowing, intelligent and voluntary, but if a suspect requests counsel, all interrogation must cease until an attorney is present, *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), and questioning may not be resumed without an attorney unless the defendant "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984).

To trigger the protections of *Edwards*, the right to counsel must be "specifically invoked," 451 U.S. at 482, 101 S.Ct. at 1884, which may be accomplished by indicating "in any manner and at any stage of the process" that counsel is desired. *Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612–13. Moreover, "[d]oubts must be resolved in favor of protecting the constitutional claim.... [We must] give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986). Nonetheless, the Supreme Court has recognized that sometimes "an accused's asserted request for counsel may be ambiguous or equivocal." *Smith*, 469 U.S. at 95, 105 S.Ct. at 493. The Court has not defined ambiguity in this context or ruled on the consequences thereof. See *Smith*, 469 U.S. at 96 n. 3, 105 S.Ct. at 493 n. 3; *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 832 n. 3, 93 L.Ed.2d 920 (1987). Counsel has not directed us to any Second Circuit cases

squarely on point, and our own research has not uncovered any. Cf. *Anderson v. Smith,* 751 F.2d 96, 101–03 (2d Cir.1984) (invocation of right to remain silent held unambiguous); *Wilson v. Henderson,* 584 F.2d 1185 (2d Cir.1978) (clarification of possible invocation of right to remain silent), rehearing in banc denied, 590 F.2d 408, cert. denied, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979).

■ However, other courts have considered the problem. The Sixth Circuit has held that even an equivocal or ambiguous reference to counsel requires cessation of questioning. *Maglio v. Jago,* 580 F.2d 202, 205 (6th Cir.1978). Some courts have "attempted to define a threshold standard of clarity" and have held that requests for counsel below the threshold do not trigger the right to counsel. See *Smith,* 469 U.S. at 96, n. 3, 105 S.Ct. at 493, n. 3 (citing cases). The trend among circuit courts that have considered the problem, however, is to adopt the Fifth Circuit's approach that when a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel. See *United States v. Porter,* 776 F.2d 370 (1st Cir. 1985), cert. denied, — U.S. —, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *United States v. Riggs,* 537 F.2d 1219, 1222 (4th Cir.1976); *United States v. Cherry,* 733 F.2d 1124, 1130–31 (5th Cir.1984), cert. denied, — U.S. —, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir.) (in banc), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979); *United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985). Several district court judges in our own circuit have also adopted this view. *United States v. Chansriharaj,* 446 F.Supp. 107 (S.D.N.Y.1978) (Leval); *United States v. Prestigiacomo,* 504 F.Supp. 681, 683 (E.D.N.Y.1981) (Nickerson) (alternative holding); *United States v. Weston,* 519 F.Supp. 565, 572 (W.D.N.Y. 1981) (Curtin); *United States v. Penosi,* 548 F.Supp. 200 (S.D.N.Y.1982) (Lasker), aff'd without op. sub nom. *United States v. Castaldi,* 742 F.2d 1444 (2d Cir.1983).

Under this approach, questions aimed at clarifying a request must be strictly limited to that purpose and may not be used to elicit incriminating information; the police may not use a statement made after an equivocal request but before the request is clarified. See *Fouche,* 776 F.2d at 1405 (citing cases). See also *Anderson,* 751 F.2d at 104 n. 9.

Assessing these various lines of authority, we think that the Sixth Circuit approach needlessly hampers the police without helping suspects who desire to assert their rights because as soon as the word or concept "lawyer" is mentioned, all questioning must cease, even if the suspect did not intend to stop. On the other hand, the Constitution, *Miranda* and the cases construing it require that we take care that suspects be allowed to invoke their rights freely. Suspects should not be forced, on pain of losing a constitutional right, to select their words with lawyer-like precision. This is especially true of suspects, like Gotay, who are not perfectly fluent in English or the law. *Edwards* sought to establish "a bright-line rule to safeguard pre-existing rights." *Solem v. Stumes,* 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984). Allowing custodial authorities to clarify ambiguous requests will help them, as well as reviewing courts, to determine on which side of the bright line the request falls. We therefore join the First, Fourth, Fifth, and Ninth Circuits and adopt their approach to ambiguous requests for counsel.

### A. Gotay's December 4 Statements

■ Gotay's first refusal to be questioned was given at her home on December 4, 1985, just after her arrest, when she said to Higgins after receiving *Miranda* warnings, "No, no, I am very afraid. I don't want to talk in front of these people." By no stretch can this statement be construed as a request for counsel, since its "ordinary meaning" is that Gotay did not want to speak with her co-defendants present. *Connecticut v. Barrett,* 107 S.Ct. at 832. Continuing questioning was therefore entirely proper.

■ Gotay's statement later that day at DEA headquarters is different. Although what she said was not recorded verbatim, DEA agent Tully testified that, when informed of her rights, Gotay "told me she couldn't afford a lawyer, that she was concerned about obtaining a lawyer."

This statement is arguably a clear request for counsel. The government contends that all Gotay expressed was a concern about obtaining counsel for trial, not for the interrogation; it supports this claim by citing Gotay's statement to Sobol on the next day, December 5. The argument is not strong. First of all the December 5 statement is irrelevant under *Smith*, 469 U.S. at 98–99, 105 S.Ct. at 494–95. ("Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is ... intolerable. 'No authority, and no logic, permits the interrogator to proceed ... as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement.'") Tully's testimony about Gotay's December 4 statement does not indicate that Gotay was interested only in future counsel. Indeed, Tully was the first to suggest that counsel would not be immediately available when he said "The court *will* take care of that." (emphasis added). Moreover, the Supreme Court has been notably generous in construing the temporal aspects of requests for counsel. For example, in rejecting the prosecution's argument that "respondents may not have actually intended their request for counsel to encompass representation during any further questioning," the Court stated that " 'Although judges and lawyers may understand and appreciate the subtle distinctions between the Fifth and Sixth Amendment rights to counsel, the average person does not. When an accused requests an attorney ... he does not know which constitutional right he is invoking; he therefore should not be expected to articulate exactly why or for what purposes he is seeking counsel.... The simple fact that defendant has requested an attorney indicates he does not believe that he is sufficiently capable of dealing with his adversaries single-

handedly.' " *Michigan v. Jackson*, 475 U.S. 625, 632–33 & 633–34 n. 7, 106 S.Ct. 1404, 1409–10 & 1410 n. 7, 89 L.Ed.2d 631 (1986). See also *Edwards*, 451 U.S. at 479, 101 S.Ct. at 1882 ("I want an attorney before making a deal" held to be request for immediate counsel even though no deal ever made); *Oregon v. Bradshaw*, 462 U.S. 1039, 1041–42, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 ("I do want an attorney before it goes very much further" considered to be request for attorney immediately). Cf. *Smith*, 469 U.S. at 93, 105 S.Ct. at 491–92 ("Uh, yeah. I'd like to do that" followed by "Yeah and no, uh, I don't know what's what, really" held unambiguous).

Even if Gotay's statement were not a clear request for counsel, it was certainly an ambiguous request. On the facts of this case, we need not decide whether it was clear or ambiguous because either way we find that the government's continued interrogation was improper. If the statement is regarded as clear, no further interrogation would be proper under *Smith* unless Gotay initiated the discussion and knowingly, intelligently, and voluntarily waived her rights. 469 U.S. at 95, 105 S.Ct. at 492–93. On the record before us, there is no doubt that Gotay did not initiate the further questioning. On the other hand, if the statement is regarded as ambiguous, only questions designed to clarify the ambiguity would be permitted, and Tully admits that he "started asking her about the source of the heroin" immediately after the statement in issue. Thus, whether Gotay's request is construed as clear or ambiguous, the continued December 4 interrogation at DEA headquarters was improper and the statements made during it must be suppressed.

### B.   The December 5 Statements

The December 5 statements should also have been suppressed. Taken on their own, they contain at least an ambiguous request for counsel. This alone is enough to justify exclusion, as explained above. We therefore need not decide whether Gotay's request for counsel on December 4 tainted the December 5 interrogation as

well. Also, because the issue was not raised on appeal, we need not consider whether Gotay's rights were otherwise violated by this prearraignment interview by an Assistant United States Attorney. See *United States v. Foley*, 735 F.2d 45 (2d Cir.1984), cert. denied, 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985); *United States v. Mohabir*, 624 F.2d 1140, 1145–53 (2d Cir.1980) (criticizing practice of United States Attorney's Office for the Southern District of New York of interviewing uncounseled defendants before presentation to magistrate.)

### C. Harmless Error

The government argues that any error in admitting Gotay's statements was harmless because there was so much other evidence of guilt. See *United States v. Morales*, 834 F.2d 35, 40–41 (2d Cir.1987) (Oakes, J., concurring); *United States v. Moody*, 649 F.2d 124, 128 (2d Cir.1981). In *Moody*, for example, defendant was stopped at Kennedy airport as she was going through customs and taken to a separate room. Agents conducted a "patdown" and found a plastic bag containing a white powder. Without reading *Moody* her rights, agents asked her what the powder was, and she replied "it is heroin." 649 F.2d at 126. Field tests evidently confirmed that the substance was heroin. Since the agents' suspicion had already been aroused and since tests, which were inevitable, showed that the substance was heroin, one can easily understand this court's characterization of the effect of *Moody*'s statement as *de minimis*. The same cannot be said of Gotay's statements.

■ As discussed in greater depth below in relation to the sufficiency of the evidence, the proof of distribution on October 16 was quite thin without Gotay's confession that she had been "selling heroin and cocaine for a few months" before December. *Moody*'s short statement related to an easily provable physical fact (albeit one that negated a defense of mistake), but Gotay's more lengthy statements involved her past criminal activities and her knowledge about the local drug trade, facts not easily provable by physical evidence but which are probative of long-term involvement in heroin distribution.

There was much more evidence implicating Gotay in the November 26 distribution, including Higgins' statement that Aviles said that he bought "Elegante" heroin from "Angie," which the jury could infer was a nickname for Angelita. Nonetheless, Gotay's statements—including an admission that "I knew you were the man [the police] when you came in my apartment" on November 26—eliminated the need for the inference, strengthened Higgins' second-hand testimony and explained why Gotay had not sold heroin to Higgins directly. Moreover, unlike Moody who was carrying the drugs on her person, Gotay was less easily linked with the drugs sold by someone in the apartment she shared with other members of her family. In total, we cannot "declare ... beyond a reasonable doubt" that there is no " 'reasonable possibility that the evidence complained of might have contributed to the conviction' " on the two distribution counts. *Chapman v. California*, 386 U.S. 18, 24, 23, 87 S.Ct. 824, 828, 827, 17 L.Ed.2d 705 (1967).

■ The three December 4 possession counts are different. There, Gotay was physically present when large quantities of brand-name drugs, drug paraphernalia and cash were found in plain view in the apartment she rented. In addition, Gotay tried to prevent the agents from entering, while others threw drugs and cash out the window, and Aviles said he got Elegante heroin from Angie. Taken together, this evidence was so overwhelming that the admission of the statements was harmless.

Gotay also argues that her December statements were involuntary and that she could not understand her rights when they were read to her in English, instead of in Spanish. Since we have already excluded Gotay's statements on December 4 and 5, it is not necessary to discuss this argument in detail. It is enough to note that we would not reverse the district court in its conclusion that the statements were voluntary.

### III. Sufficiency of the Evidence

■ The effect of our rulings is to reverse the judgment of the district court on two distribution counts but to allow a new trial on them with the evidence of Gotay's statements excluded. However, Gotay argues that the evidence on these two counts was insufficient to convict her of distributing heroin on October 16 and November 26. She says that a new trial should therefore be barred by the double jeopardy clause of the Constitution. Specifically, Gotay claims that there was no evidence to show that on those dates she sold or had dominion or control over the drugs, which she suggests may have belonged to someone else living in her apartment.

Gotay also argues that in evaluating the evidence we should not consider statements we have ruled excludable. See *Greene v. Massey*, 437 U.S. 19, 26 n. 9, 98 S.Ct. 2151, 2155 n. 9, 57 L.Ed.2d 15 (1978); *United States v. Smith*, 778 F.2d 925, 933 (2d Cir.1986). Because we find the evidence sufficient even without the statements, we do not decide whether we should consider them.

In making her insufficiency argument, Gotay acknowledges that she bears a "very heavy burden," since we must view the evidence in the light most favorable to the government and construe all permissible inferences in its favor. The evidence is sufficient if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original). *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Although we agree that "mere presence at the apartment, even coupled with the knowledge that a crime was being committed there, is not sufficient to establish her guilt," *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983); see also *United States v. Kearse*, 444 F.2d 62, 63 (2d Cir.1971), the evidence shows more than "mere presence."

On October 16, McCoy purchased "Faces" heroin from someone in Gotay's apartment. On November 26, Aviles purchased "Elegante" heroin from "Angie," which the jury could find is a nickname for Angelita. On December 5, agents found Faces and Elegante glassine envelopes in the apartment; Gotay was present at the time and tried to prevent the agents from entering the apartment before the drugs had been thrown out the window. From Aviles' testimony, the jury could have concluded that Gotay distributed heroin on November 26. The evidence regarding October 16 is more circumstantial, but we think that the jury could infer from the labeled envelopes that the business broken up in December was operating as early as October 16; since there was no evidence to suggest someone else sold the "Faces" heroin, cf. *United States v. Morgan*, 581 F.2d 933, 936–37 (D.C.Cir.1978), the jury could conclude that Gotay distributed "Faces" heroin on October 16.

Gotay does not challenge the sufficiency of the government's proof that she is guilty of three counts of possessing heroin and cocaine on December 4.

We have considered appellant's other arguments and find them without merit.

### IV. Conclusion

We find that because Gotay had at least ambiguously asked for a lawyer during interrogation, the questioning conducted at DEA headquarters on December 4 and 5 was improper and the statements elicited on those dates should have been suppressed.

For the reasons stated above, we reverse the judgment of the district court on the two distribution counts. Because we find that the evidence presented at trial was sufficient to support conviction on those counts, the double jeopardy clause does not bar retrial, if the government so chooses. However, we affirm the convictions on the three counts of possession of heroin and cocaine on December 4.

Affirmed in part, reversed in part.