**UNITED STATES of America**

v.

**Sik Sze YAN, a/k/a "Ah Shu," et al., Defendants.**

**No. 88 Cr. 650 (CSH).**

United States District Court, S.D. New York.

Dec. 19, 1988.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; Howard Shapiro, Asst. U.S. Atty., of counsel.

Mass & Rudin, New York City, for defendants; Joel B. Rudin, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Yan has moved before this Court for orders (1) suppressing evidence obtained as a result of what Yan contends was an illegal search of his apartment and (2) granting a hearing to determine the audibility and admissibility at trial of certain tape recordings made by the government as part of its investigation. In addition, Yan asks that he be deemed as joining in motions that might be made by his co-defendant, Wai Kwok Wong, to the extent such future motions may be applicable to him.[1] Yan's applications are addressed in turn below.

The indictment in this case charges Sik Sze Yan and Wai Kwok Wong with conspiring to distribute and possess with intent to distribute approximately eighty-three kilograms of heroin (Count I) and with possession with intent to distribute approximately 1400 grams of heroin (Count II), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

According to the complaint, on August 30, 1988 law enforcement agents in Boston discovered approximately 183 pounds of heroin hidden inside five cylindrical metal rollers of a beansprout washing machine. After removing all but 1.4 kilograms of the heroin, agents apparently watched the machine until, on September 7, 1988, four individuals were arrested in Boston while attempting to dismantle the machine and remove the cylinders containing the heroin.

Having learned that the machine was destined for New York City, agents allowed it to be sent there containing the 1.4 kilograms of heroin. Upon the machine's arrival in New York, Yan's co-defendant, Wai Kwok Wong, was contacted through a telephone paging device sometime during September 7, 1988. Law enforcement agents or persons working on their behalf then arranged with Wong, apparently during a telephone conversation, for him to pick up the machine in the vicinity of 42nd Street and Twelfth Avenue in Manhattan. Later that evening, at approximately 9:50 p.m., Wong and Yan were arrested when they met with two undercover agents at

---

1. At present, no motions have been made by co-defendant Wong. The government has not opposed this portion of Yan's motion, and I therefore grant it. However, I leave the burden on Yan to express explicitly his concurrence with motions made by his co-defendant where such concurrence would not reasonably appear obvious.

the prearranged location and allegedly assisted in transferring two cylinders from the beansprout washing machine in the trunk of an agent's car to the trunk of their car. The conversation at this meeting was recorded. The tapes form one of the issues raised on this motion.

*Motion to Suppress*

█ The day after Yan was arrested he signed a consent to search form, prepared in both English and Chinese, giving special agents of the Drug Enforcement Administration power to search his apartment. That form specifically stated that Yan had not been threatened nor forced in any way and that he freely consented to the search. When law enforcement agents searched Yan's apartment they found one loaded firearm, $9,000 in U.S. currency, and keys to two safe deposit boxes. After obtaining search warrants, agents searched the safe deposit boxes. There they found a quantity of jewelry and heroin. In his motion, Yan seeks to suppress all evidence discovered as the direct or indirect result of what he contends was an illegal search of his apartment.

According to the affidavit of Special Agent Leslie Gee, Exhibit 2 to the government's memorandum of law, Yan was advised of his rights in Chinese at approximately 10:30 p.m. on September 7, 1988, the night he was arrested. Those rights included the assistance of an attorney. Gee's affidavit says at ¶ 3: "At no time did Yan request an attorney. However, when we advised Yan of his right to be represented by counsel, he stated that he could not afford a lawyer." That account is consistent with Yan's own affidavit, submitted in reply to the government's opposing papers, where Yan says: "I did not specifically request an attorney, but I did tell agents that I was not sure I could afford an attorney. I understood my statement to be a request for assistance in obtaining an attorney." (Yan affidavit at ¶ 2.)

The day after Yan was arrested he was taken to the courthouse for processing and arraignment. It is the government's contention that Yan was taken to the vicinity of the U.S. Marshal's holding cell on the third floor of the courthouse, and that at approximately 11:00 a.m., while seated on a bench outside the cell and in the presence of three officers, Yan signed the consent to search form that led to the search of his apartment and the safe deposit boxes. (Affidavit of Special Agent Barry Tang at ¶ 2). After being processed by the marshals, Yan was then taken to the office of Pretrial Services and later to Magistrate's Court for arraignment.

The timing of Yan's signing of the consent to search form is contested by defendant. According to Yan's affidavit, it was only *following* his interview with Pretrial Services that Yan signed the consent to search form. Yan contends he was told during his interview with Pretrial Services that nothing he said could be used against him at trial, and that when the agents asked whether they could search his apartment he thought the search was part of the procedures employed by Pretrial Services. In Yan's words: "I thought the consent was part of the court's bail processing. The agents assured me that it was routine. I would not have consented if I had understood that all evidence found during the search could be used against me at trial." (Yan affidavit at ¶ 3.)

The parties' varying accounts as to when and how the consent to search form was signed raise factual issues relevant to the voluntariness of Yan's consent. A hearing may have to be held to resolve those issues at some time in the future. For the present, however, no hearing is required for the reason stated below.

Defendant argues in the reply affidavit of counsel that the government's request to search his apartment, which was made, according to Yan, after he had requested an attorney but had not been provided with one, violates rights guaranteed him by the constitution and that evidence obtained as a result of his uncounseled communication should be suppressed. He cites *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1980) ("emphasiz[ing] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an ac-

cused in custody if he has clearly asserted his right to counsel").

The government, in response, cites cases supporting the proposition, well established in this and other circuits, that *Miranda* warnings are not a prerequisite to an effective consent to search. *See United States v. Lemon*, 550 F.2d 467, 472 (9th Cir.1977); *United States v. Faruolo*, 506 F.2d 490 (2nd Cir.1974). The government would have me infer from those cases that the right to counsel can never, in any fashion, impact on the legality of a search. However, the government's proposition does not follow from the authority it cites. Whether *Miranda* warnings are essential to a voluntary consent to search is an entirely different issue from whether the government may request such consent from a person in custody who has already requested an attorney. At least that appears to be the view of the Court of Appeals for the Seventh Circuit, which has recently said, after an analysis of the Supreme Court's decision in *Edwards v. Arizona, supra:*

> The detectives arguably violated this bright-line rule when they asked the defendant after his unsuccessful attempts to reach his attorney whether he wished to discuss his consent to the search of his apartment. The cases do not speak in terms of allowing a person in custody the *opportunity* to seek counsel, they speak of making an attorney available.... We find ... that the government did violate the defendant's right to consult with counsel, and the defendant's consent to search obtained after that violation therefore should have been deemed ineffective.

*United States v. D'Antoni*, 856 F.2d 975, 982 and 985 (7th Cir.1988) (emphasis in original) (but finding the above violation to be harmless error).

The Seventh Circuit's finding in *D'Antoni* is relevant to the case at bar only if Yan expressed his desire for counsel unambiguously, or, if his statements to law enforcement officers were ambiguous, they created an obligation on the part of the agents

to inquire further into Yan's desire for counsel. On the latter point, the case of *United States v. Gotay*, 844 F.2d 971 (2d Cir.1988), declares the rule in the Second Circuit: "[W]hen a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." *Id.* at 975. Interestingly, Chief Judge Feinberg added: "Suspects should not be forced, on pain of losing a constitutional right, to select their words with lawyer-like precision. This is especially true of suspects, like Gotay, who are not perfectly fluent in English or the law." *Id.* That characterization applies to Yan.

It is common ground that after the agents advised Yan of his right to a lawyer, Yan said he could not afford one. Given the circumstances, surely that observation "arguably can be construed as a request for counsel" under *Gotay*, albeit an equivocal one. Yan characterizes his statement "to be a request for assistance in obtaining an attorney." To be sure, that characterization is self-serving; but it is not implausible: why express an inability to afford assistance one does not want? If Yan's comment be construed as an equivocal request for counsel, the agents' duty under *Gotay* was clear: cease interrogation and clarify Yan's desire for counsel.[2] *Gotay* involved post-arrest statements, while the case at bar concerns a consent to search and the search's fruit, but *quaere* whether there is a difference in principle.

Thus the present record presents an arguable basis for granting Yan's suppression motion as a matter of law. I will not do so, however, because neither side has briefed the applicability of *Gotay* to the facts at hand. (The government cites the case, but does not discuss it). Similarly, neither side has cited nor discussed the Seventh Circuit's *D'Antoni* decision in their briefs. Both *Gotay* and *D'Antoni* raise legal issues that, depending on how they are resolved, may obviate the need for

---

**2.** No question of retroactive application of the *Gotay* rule arises. The Second Circuit decided

the case on April 15, 1988. The events at bar occurred in September, 1988.

a full evidentiary hearing; for if there were a failure by law enforcement agents to clarify Yan's statement, and if such a failure were a violation of constitutional principles enumerated in *Edwards v. Arizona,* then evidence obtained as a result of the search of Yan's apartment may have to be suppressed, independent of defendant's alternative claim that he did not understand the use that was to be made of the consent to search form.

I therefore direct counsel to submit briefs on or before noon, December 29, 1988, addressing the question whether evidence seized as the direct or indirect result of communications had by law enforcement agents with defendant Yan after he arguably requested an attorney should be suppressed on grounds akin to those expressed by the Seventh Circuit in *United States v. D'Antoni, supra.* I will then decide whether an evidentiary hearing is warranted.

*Audibility Hearing*

█ Counsel for defendant Yan contests the audibility of two tapes provided him by the government. Both tapes were apparently made at the time of Yan's arrest. The government concedes that one of the tapes, the one it characterizes as "a transmitted copy of the other," is substantially inaudible and therefore will not be offered at trial. The other tape, designated by the notation "N–8," is sufficiently audible in the government's view and will be offered at trial. A transcript of that tape is included as Exhibit 3 to the government's memorandum of law.

At the time defendant's counsel filed his motion he had not seen a transcript of the tape at issue, and there is no reason to believe that he speaks Chinese or Vietnamese, the two languages used on the tapes. (Affidavit of Joel B. Rudin at ¶ 15). The government argues that defendant's application for an audibility hearing should be rejected unless, after viewing the government's transcript, counsel can make more specific challenges to the tape's audibility. I agree. It may be that after viewing the government's transcript, counsel for defendant will be satisfied as to the tape's audibility, thereby saving this Court and all parties considerable time and effort. If that does not prove to be the case, defendant is free to renew his request, preferably citing specific disagreements with the government's transcript based on a competing transcript obtained by defendant.

If defendant does intend to renew his request for an audibility hearing, he must do so on or before noon, December 29, 1988. Any response by the government must be made on or before January 4, 1988. In their papers, counsel for both parties should define the procedures they believe this Court should follow if it determines an audibility hearing is warranted, given the fact that I do not speak Chinese or Vietnamese. Citation to relevant authority is encouraged.

*Conclusion*

Decision on defendant Yan's motion to suppress evidence allegedly obtained directly and indirectly as the result of an illegal search of his apartment is reserved pending further briefing by the parties. Defendant's motion for an audibility hearing is denied on the present record with leave granted to renew.

The foregoing is SO ORDERED.