UNITED STATES of America, Plaintiff,

v.

Gregory SCARPA, Jr., Defendant.

No. CR–87–760 (S–2).

United States District Court,
E.D. New York.

Dec. 2, 1988.

Valerie Caproni, Jerome Roth, Asst. U.S. Attys., Brooklyn, N.Y., for plaintiff.

Joseph R. Benfante, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Following a hearing on the defendant's motion to suppress his statements, the court makes the following findings of fact. The defendant was indicted in January, 1988, together with eight other defendants. He was a fugitive at the time his co-defendants were tried and convicted and remained a fugitive for some months thereafter until he was finally apprehended at approximately 2:00 a.m. on August 29, 1988 in a motel in Lakewood, New Jersey. Immediately after his arrest, the defendant was advised of his *Miranda* rights by DEA Agent Gilbride. When the rights were begun to be read to the defendant, he interrupted Agent Gilbride and said "I understand my rights, you don't have to go on." (Tr. 28). Notwithstanding that assertion, Gilbride advised Scarpa of all of his *Miranda* rights which Scarpa said he understood.

At about that point, Agent Gilbride put on a hat on which was printed "America's Most Wanted." Scarpa looked at it and began to laugh. Gilbride asked Scarpa if he had a lawyer to which Scarpa replied that he didn't have one; that he was going to get a lawyer whose name he didn't know but that he was the same lawyer who defended Billy Meli in the case in which Meli

was charged with biting off a policeman's ear. (Billy Meli is an indicted co-defendant who was tried and convicted together with the other co-defendants). Scarpa was then transported to the Lakewood Township jail where he was lodged for the night at approximately 3:00 a.m.

Later that morning Gilbride and a Deputy U.S. Marshal transported Scarpa from Lakewood to the Federal Courthouse in Camden, New Jersey, where he was arraigned. There is some dispute about the exact time at which Scarpa was removed from the Lakewood jail. Agent Gilbride testified that they left Lakewood for Camden at 9:00 a.m. Deputy U.S. Marshal Dominick A. Cama, testified to the same effect. Records of the Lakewood Police presented by the defendant reflect that they left Lakewood approximately one hour and a half later. Agent Gilbride and Marshal Cama impressed the court as being forthright and credible and absent testimony about the circumstances and procedures under which the record entries were made, the court credits the testimony of Gilbride and Cama.

Unbeknownst to Scarpa, Agent Gilbride or the Deputy Marshals, attorney Benfante was notified of Scarpa's arrest in the early hours of the morning by a member of Scarpa's family. Shortly before 9:00 a.m. Mr. Benfante telephoned the office of the United States Attorney in Camden. He advised the Assistant U.S. Attorney with whom he spoke that he represented Scarpa and that Scarpa should not be questioned. At about the same time, Scarpa was about to begin the trip from Lakewood to Camden which took approximately two hours. The car in which they were riding was not equipped with a radio and there is no evidence that the U.S. Attorney could have communicated with that vehicle in any way. During that trip Scarpa and Gilbride conversed about a variety of things. Gilbride remarked that he didn't think Scarpa would be a fugitive as long as he was to which Scarpa replied that if he hadn't been apprehended he was planning on leaving in three days.

Gilbride made the observation that Scarpa looked different than he did on the television program "America's Most Wanted". Scarpa laughed and said the show was inaccurate in depicting him as smoking Marlboro cigarettes and drinking Chivas Regal scotch. He saw the show while he was in Florida and left for New Jersey shortly thereafter because he believed he was "too hot" in Florida. The ensuing conversation which continued in a relaxed and friendly manner touched upon whether his friends were angry with him because they went to trial while he was a fugitive. Scarpa said that they weren't—that "they aren't those type of guys, they wouldn't be mad at me." Scarpa also indicated that while he was a fugitive he was visited by Billy Meli even though Meli was under house arrest at the time.

Gilbride commented on the length of the trial of his co-defendants which Scarpa acknowledged and said "Nicky DeCarlo is my biggest problem, he talked too much." Scarpa said he did not listen to the DeCarlo tapes but was kept informed about them by his father. Scarpa then told Gilbride that he had almost been caught several weeks prior to his apprehension when the police followed one Anthony Coco who was bringing Scarpa's children to visit him in New Jersey.

Also discussed during the ride to Camden were Scarpa's brother Frank; a subpoena served on Scarpa's mother; Scarpa's assessment of Coco, Kevin Granato and Mario Parlagreco as "stand-up guys", and Scarpa's visits to his father in Brooklyn during the time he was a fugitive. Scarpa also repeatedly asked Agent Gilbride to reveal who gave him up. At no time during the two hour drive from Lakewood to Camden did Scarpa ask if he could have an attorney present and he never indicated to Agent Gilbride in any way that he did not want to talk to him. The defendant's motion to suppress all the statements made by him following his arrest is denied for the reasons that follow.

Relying upon *United States v. Mohabir*, 624 F.2d 1140 (2d Cir.1980) the defendant contends that the *Miranda* warnings given

to him were insufficient to waive his post-indictment Sixth Amendment right to be represented by counsel prior to interrogation. *Mohabir* held that before an indicted defendant could be interrogated he was to be taken before a neutral judicial officer who would advise him of his rights and explain to him the significance of his right to remain silent and of his right to the presence of an attorney should he decide to speak to the government after formal charges were lodged against him. Although the court recognized that this additional safeguard was not required by the Constitution it imposed it nevertheless in the exercise of its supervisory power, believing that

> [T]he government has a "heavy burden" of showing a waiver of Sixth Amendment rights by an indicted defendant and that burden cannot be discharged unless a "higher standard" is satisfied than that met by merely showing that the accused made his statements after the appropriate *Miranda* warnings were given.

The Second Circuit's view of an indicted defendant's Sixth Amendment right was specifically rejected in *Patterson v. Illinois*, —— U.S. ——, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) which held that:

> [I]t is our view that whatever warnings suffice for *Miranda's* purposes will also be sufficient in the context of postindictment questioning. The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities. With respect to this inquiry, we do not discern a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at post-indictment questioning.

108 S.Ct. at 2398. Any doubt that may have lingered about the continued efficacy of *Mohabir* was laid to rest by the following observation by the Court:

As have a majority of the Courts of Appeals, we reject *Mohabir's* holding that some "additional" warnings or discussions with an accused are required in this situation, or that any waiver in this context can only properly be made before a "neutral ... judicial officer."

108 S.Ct. at 2396–97, f.n. 8.

All other things being equal, the court would conclude that Scarpa had been fully informed of his *Miranda* rights and that he knowingly and voluntarily waived those rights and that the government proved that beyond a reasonable doubt (aware that preponderance of evidence is the standard of proof in this regard). The defendant also contends, however, that *Patterson* notwithstanding, his statements must be suppressed pursuant to *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This contention is based upon Scarpa's statement that "he didn't have a lawyer, that he was going to get a lawyer. But he didn't know the guy's name." (Tr. 29). That statement, it is argued, was a request for counsel after which all interrogation or the functional equivalent thereof, *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) should have ceased. The defendant further contends that if his statement was not a clear and explicit request for counsel, then it was at least equivocal after which only questions aimed at clarification were justified. *United States v. Gotay*, 844 F.2d 971 (2d Cir.1988).

■ To begin with, Scarpa's statement could not be deemed ambiguous, neither could it be deemed equivocal. The meaning of the words he spoke is exquisitely clear. It would be an exercise in futility to attempt to convey the meaning of those words without simply repeating them. To invoke the holding of *Gotay* to those words would be no less than to endow the word "lawyer" "with talismanic qualities" *Nash v. Estelle*, 597 F.2d 513 (5th Cir.1979) which this circuit has abjured. *Gotay*, 844 F.2d 975. Having determined that the defendant did not express a desire to communicate with the government only through counsel which he then requested and that

his statement was neither ambiguous nor equivocal, the question is whether an expressed desire for counsel in the future invokes the rule of *Edwards v. Arizona?* I conclude that it does not.

Reference has already been made to the undesirability of endowing the word "lawyer" with talismanic qualities. *Nash v. Estelle, supra.* Another Fifth Circuit case, *United States v. Jardina,* 747 F.2d 945 (5th Cir.1984) expressed it similarly felicitously at page 945: "A defendant does not invoke his right to counsel any time the word falls from his lips." After commenting that the words spoken by Jardina never asked that counsel be present at the ongoing questioning and that he wished his attorney to work out a cooperative deal with the government in the future, that court concluded that "Jardina's statements and actions did not invoke any *present* right to counsel." 747 F.2d at 945 (emphasis added). In accord with *Jardina,* is *Bradburn v. McCotter,* 786 F.2d 627 (5th Cir.1986) where the court held that the defendant, arrested in Nevada, who stated that he "wanted to wait until he got back to Dallas to get a court appointed lawyer" did not make "even an equivocal request for counsel in Nevada and *Edwards* presented no impediment to the Nevada interrogation." The citation of other cases which make manifest the requirement that the defendant express a desire to deal with police only through counsel *presently,* can be multiplied. Sufficient, perhaps, will be a reference to a trenchant analysis of this and related issues by Tomkowicz, *Standards for Invocation and Waiver of Counsel in Confession Contexts,* 71 Iowa L.Rev. 975 (1986) (Tomkowicz). At pages 1012–13, the author writes:

> To invoke the protection of fifth or sixth amendment counsel in confession contexts, any conduct that a reasonable person would conclude is more likely than not an expression of a present desire for counsel ought to suffice. This benchmark, like all others, harbors risks. Nevertheless, it accommodates rival interests and is grounded in the belief that our primary objectives should be diminishing the risks of compulsory self-incrimination and imbalanced adversarial contests, without excessively restricting official authority.

> Several facets of the proposed test merit brief comment. First, for conduct to qualify as a valid request for counsel it must be "more likely than not" that the conduct is an assertion.... By excluding unlikely assertions, that is, behavior by suspects that probably does not express a need, the proposed benchmark will limit the constriction of investigative authority. The prescribed level should not admit too many undeserving actions into the invocation category. If the standard does err slightly on the side of overprotection, cautious preservation of constitutional values requires as much.

> Second, the standard prescribes evaluation of the suspect's conduct from an objective perspective, that is, according to a reasonable person's beliefs. On balance, objective standards are preferable because of the difficulty, if not futility, of confidently ascertaining subjective states of mind.

> In addition, the relevant mindset that satisfies the standard delineated is a *present* desire for counsel. That criterion makes sense in both fifth and sixth amendment situations. Behavior that is not likely to be an expression of a present desire, but at best evinces a wish for counsel at a future stage, should not qualify as an invocation because it fails to convey adequately, and should not be presumed to convey, present vulnerability to governmental pressure or superiority and an immediate need for aid. It is only such expressions of vulnerability and need that justify the heightening of protections that follows invocations.

(footnotes omitted).

Having concluded that the defendant unambiguously and unequivocally expressed only a *future* desire for counsel, the proscription of *Edwards v. Arizona* has no application here.

■ The defendant also contends that all statements made by him after Mr. Joseph Benfante spoke by telephone with the Unit-

ed States Attorney in Camden, New Jersey should be suppressed. Since the record indicates that that telephone conversation occurred at approximately 9:00 a.m., suppressed, he contends, should be all statements made to Agent Gilbride on the drive from Lakewood to Camden which was between 9:00 and 11:00 a.m., approximately. It is not disputed that Agent Gilbride had no knowledge of the communication between Mr. Benfante and the United States Attorney, nor is it disputed that the defendant had no knowledge that Mr. Benfante was purporting to act on his behalf. It is also not disputed that communication between the U.S. Attorney and the vehicle in which the defendant was riding was not possible. Two issues require resolution in the determination of this aspect of the motion. First, is the communication to one governmental authority (the United States Attorney) imputed to another (Agent Gilbride)? Second, does the fact that the defendant had no knowledge that an attorney was purporting to act on his behalf have any legal significance?

Turning to the first issue, it appears to be well settled that the knowledge of one governmental agent should be imputed to another. In *Michigan v. Jackson*, 475 U.S. 625, 634, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1985) the Court said that:

> ... Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendant's unequivocal request for counsel to another state actor (the court).

(footnotes omitted). *See also Arizona v. Roberson*, —— U.S. ——, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988) (Finally, we attach no significance to the fact that the officer who conducted the second interrogation did not know that the respondent had made a request for counsel); *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985) (all officers dealing with accused presumed to have knowledge of prior invocation); *United States v. Obregon*, 748 F.2d 1371, 1377 (10th Cir.1984); *United States*

*v. Scalf*, 708 F.2d 1540, 1544 (10th Cir.1983) (once suspect has invoked rights, "knowledge of that request is imputed to all ... officers who subsequently deal with suspect"); *White v. Finkbeiner*, 687 F.2d 885, 887 n. 9 (7th Cir.1982) (to allow admission of confession because initiating "interrogators were not informed of [a] request for counsel" would "be inconsistent with" and "might permit ... circumvention of" *Edwards*). The question posed by the first issue would require an affirmative answer and the knowledge of the Assistant United States Attorney is thus imputed to Agent Gilbride.

I now turn to the second issue, namely, whether the intervention of Mr. Benfante without the knowledge of the defendant has any legal significance. A critical reading of the seminal cases compels the conclusion that the intervention of Mr. Benfante without the knowledge of the defendant does not conjure up the protective restrictions of *Edwards*. In *Miranda v. Arizona*, for example, the Court wrote: "If the individual states that *he* wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (emphasis added). *Edwards v. Arizona, supra*, reveals that:

> ... the Court has strongly indicated that additional safeguards are necessary when *the accused asks* for counsel; and we now hold that when *an accused* has invoked *his* right to have counsel present during custodial interrogation ...
>
> \*    \*    \*    \*    \*    \*
>
> We further hold that *an accused such as Edwards* having expressed *his* desire to deal with the police only through counsel, is not subject to further interrogation by the authority. (emphasis added).

More recently, in *Arizona v. Roberson, supra*, 108 S.Ct. at 2097–8, the Court wrote:

> The rule of the *Edwards* case came as a corollary to *Miranda's* admonition that "[i]f *the individual* states that *he* wants an attorney, the interrogation must cease until an attorney is present.

In *Edwards* we "... emphasize[d] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate *an accused* in custody if *he* has clearly asserted *his* right to counsel."

\* \* \* \* \* \*

... if a *suspect* believes that *he* is not capable of undergoing such questioning without advice of counsel, ...

\* \* \* \* \* \*

"... the *accused* having expressed *his* own view that *he* is not competent to deal with authorities without legal advice, ..."

\* \* \* \* \* \*

In *Fare v. Michael C.*, [442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)] we explained that the "relatively rigid requirement that interrogation must cease upon the *accused's* request for an attorney ..." (emphasis added).

Excerpts which emphasize the assertion of the right to counsel by the accused can be multiplied almost endlessly.

*Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) is instructive. The defendant was advised of his *Miranda* rights following his arrest and after executing written waivers, confessed to a murder. He never requested an attorney during his pre-arraignment interrogation. While he was in custody, his sister attempted to retain a lawyer to represent him. The attorney telephoned the police station and was assured that the defendant would not be questioned further until the following day. Inculpatory statements were, in fact, made by the defendant during interrogation later that evening. The question before the Court was whether the conduct of the police or the defendant's ignorance of the attorney's efforts to reach him required suppression of his inculpatory statements. The Court held that neither required exclusion of the defendant's confession. At page 422, 106 S.Ct. at 1141, the Court wrote:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.

The Court rejected the analysis of the Court of Appeals in that case that "the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result." 475 U.S. at 422, 106 S.Ct. at 1141. At another point in the opinion the Court had occasion to refer to the "elemental and established proposition that the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled." 475 U.S. at 433, f.n. 4, 106 S.Ct. at 1147, f.n. 4. Those observations are precisely applicable here. In Tomkovicz, *supra,* at page 1020, f.n. 166 following a brief consideration of this aspect of *Moran,* the author concludes, "In sum, there seems to be no good reason to recognize counsel as a surrogate for threshold invocation purposes in either fifth or sixth amendment cases." That view was most recently adopted in this circuit in *Terry v. LeFavre,* 862 F.2d 409, 412 (2nd Cir.1988), where, in a Fifth Amendment context, the court said:

> Mrs. Terry's attempt to contact an attorney did not constitute the invocation of Terry's right to counsel. The record does not show that Terry exercised his right to counsel by requesting that his mother try to reach an attorney.... Although "we must give a broad interpretation to a defendant's request for counsel" ... there is no legal support for the argument that Mrs. Terry could invoke the right to counsel on behalf of her son.

Similarly here, there is nothing in the record to show that Scarpa exercised his right to counsel by requesting that someone else try to reach an attorney.

It is important to remember that *Moran* addressed the issue presented in the con-

text of pre-arraignment interrogation. There is dicta in that case which might suggest a view different from the view expressed and the conclusion reached by this court. At 475 U.S. 428, 106 S.Ct. at 1145, for example, the Court said:

"And we readily agree that once the [Sixth Amendment] right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a 'medium' between [the suspect] and the State during the interrogation."

And on page 430, 106 S.Ct. at 1146:

As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation.... More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protection of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. It purpose, rather, is to assure that in any "criminal prosecutio[n]," ... the accused shall not be left to his own devices in facing the "prosecutorial forces of organized society." ... By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," ... is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing."

The continued viability of that dicta is extremely doubtful in the light of *Patterson v. Illinois, supra,* decided three years later. In deciding that post-indictment Sixth Amendment right to counsel can be waived the Court emphasized that *Edwards* and its progeny preserved "the integrity of an accused's choice to communicate with police only through counsel."

*Edwards* and its progeny were not intended to prevent an accused from making a choice "as to whether he will face the State's officers during questioning with the aid of counsel or go it alone." 108 S.Ct. 2389 at 2394. The Court also explicitly rejected the assertion that the Sixth Amendment right to counsel is superior to that of the Fifth Amendment or that the Sixth Amendment right is more difficult to waive than the Fifth and held that the *Miranda* warnings may suffice for a knowing and intelligent waiver thereafter of both the Fifth and Sixth Amendment rights. The government has more than amply sustained its burden of establishing that the defendant knowingly and intelligently waived his Sixth Amendment rights.

While the dictum of the *Patterson* court in f.n. 9, 108 S.Ct. at p. 2397 is, at first blush, troubling, upon analysis the observation in that dictum is seen to be inapplicable to this case. That footnote reads in part as follows:

This does not mean, of course, that all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*. For example, we have permitted a waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; in the Sixth Amendment context, this waiver would not be valid. *See Moran v. Burbine,* 475 U.S. at 424, 428, 106 S.Ct. at 1142, 1145.

That dictum is inapplicable for the reasons stated above in rejecting the view that Mr. Benfante was Scarpa's lawyer during the drive to Cambden. I confess to an inability to reconcile the footnote observation with the holding in *Patterson* that the *Miranda* warnings would suffice to permit a knowing and intelligent waiver of one's Sixth Amendment right to counsel and with *Moran v. Burbine* cited in that footnote. In *Moran,* 475 U.S. at 427, 106 S.Ct. at 1144, the Court wrote:

Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dis-

386

pel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. Indeed, the very premise of the Court of Appeals was not that awareness of Ms. Munson's phone call would have dissipated the coercion of the interrogation room, but that it might have convinced respondent not to speak at all ... Because neither the letter nor purposes of *Miranda* require this additional handicap on otherwise permissible investigatory efforts, we are unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation.

In the light of the foregoing disposition of the defendant's motion, no need is felt to consider the government's contention that the casual and congenial conversation between Agent Gilbride and Scarpa during the drive from Lakewood to Camden could not be reasonably construed as interrogation as that word has been defined in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). *See United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) and *United States v. Criswell,* 696 F.2d 636 (8th Cir.1983). Nor is there any felt need to consider the extent to which Scarpa himself initiated communication, exchanges or conversation with Agent Gilbride.

SO ORDERED.