**UNITED STATES of America, Appellee,**

v.

**Gregory SCARPA, Jr.,
Defendant–Appellant.**

**No. 303, Docket 89–1101.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1989.

Decided Feb. 23, 1990.

Joseph R. Benfante, New York City (Judd Burstein, New York City, of counsel), for defendant-appellant.

Jerome C. Roth, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Matthew E. Fishbein, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

Gregory Scarpa, Jr., appeals from a judgment of conviction entered on February 27, 1989, after a jury trial, in the United States District Court for the Eastern District of New York (Glasser, J.). Defendant was found guilty of conducting a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1988); engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (1982 & Supp. V 1987); conspiring to distribute marijuana in violation of 21 U.S.C. § 846 (1982); distributing marijuana in violation of 21 U.S.C. § 841(a)(1) (1982); and two counts of conspiring to commit extortion, and one count of extortion, in violation of 18 U.S.C. § 1951 (1988).

Judge Glasser sentenced Scarpa to terms of imprisonment of twenty years on the RICO, continuing criminal enterprise, extortion and extortion conspiracy counts; five years on the conspiracy to distribute marijuana count; and five years on the distribution of marijuana count. Judge Glasser also sentenced Scarpa to a five year term of special probation on the distribution of marijuana count, and imposed a $350 special assessment covering all counts. All prison terms were concurrent.

Scarpa contends on appeal that the district court erred in refusing to suppress statements he made after his arrest to an agent of the Drug Enforcement Administration ("DEA"). *See United States v. Scarpa,* 701 F.Supp. 379 (E.D.N.Y.1988). He asserts also that the district court erred in refusing to permit discovery of tape

recordings made by law enforcement authorities using a hidden microphone, which the government contends, and the district court found, reveal neither incriminating nor exculpatory evidence relevant to his case.

For the reasons that follow, we affirm.

## BACKGROUND

Scarpa was named with eight co-defendants in an indictment filed on November 2, 1987, charging various crimes involving an organized marijuana distribution business, and the use of murder and extortion to advance their goals. Two superseding indictments were filed, one on December 14, 1987 and the second on January 27, 1988. In each indictment, Scarpa was named as the leader of the "Scarpa Crew," a marijuana and extortion enterprise in which each of his co-defendants worked in different capacities selling marijuana at the College of Staten Island and several other locations in Staten Island and Brooklyn. The indictments alleged also that Scarpa participated in the extortion and, in one instance, the murder of rival drug dealers.

The eight co-defendants were tried jointly and convicted of various narcotics and extortion offenses. *United States v. Scarpa,* No. CR–87–760(s) (E.D.N.Y. Sept. 14, 1988), *appeal argued,* No. 88–1392 (2d Cir. Oct. 30, 1989). Scarpa, however, fled the jurisdiction, became a fugitive, and was not apprehended until eight months later. He was tried separately, following his arrest by DEA agents at a motel in Lakewood, New Jersey on August 29, 1988.

The marijuana business was a substantial operation with an established hierarchy and net profits of $20,000 per week on gross sales averaging $10,000 per night. Several attorneys regularly represented Crew members, and Scarpa was in possession of their phone numbers when he was arrested. Co-defendants Kevin Granato, Mario Parlagreco and Nunzio DeCarlo, all of whom reported to Scarpa, worked with Crew members at various "spots" where marijuana was sold. Christopher Gaeta and Eric Leon, two cooperating witnesses who had sold drugs for the Scarpa Crew, testified that Scarpa had spoken with them directly, that he had acknowledged to them that he was the "boss" of the marijuana business, and that other co-defendants also had recognized Scarpa as such.

Gaeta testified to a meeting with Scarpa and Kevin Granato outside the Wimpy Boys Club, a social club in Brooklyn where Crew members congregated. He also met with Scarpa in a car, a luncheonette and Mike's Candy Store. Scarpa instructed Granato to give Gaeta a marijuana spot on Fifth Avenue in Brooklyn. Granato gave Gaeta the spot, and told him that Scarpa was the boss of the Crew and a "wise guy," which he understood to mean a member of the Mafia. Gaeta testified that after he began selling marijuana for the Crew, Scarpa told him to seek out non-Crew marijuana dealers from whom Crew members could exact payments using threats and violence.

Leon started as a dealer of marijuana at the College spot and eventually was made manager of the spot. He knew of Scarpa's involvement in the marijuana business from both Crew members and Scarpa himself. Granato and DeCarlo each told Leon that the Crew worked for Scarpa. According to DeCarlo, Scarpa was a "capo" in the Colombo Family, and the Crew therefore did not have to worry about its enemies. Granato also told Leon that Scarpa protected the Crew. Scarpa himself complimented Leon on the management of the College marijuana spot after Leon took over operations from DeCarlo.

Leon, however, later had trouble with Scarpa and the Crew when he ran up a large drug-related debt. After he was warned by Granato that Scarpa wanted the debt repaid, Leon met with Scarpa at the luncheonette and offered to pay off the debt by working at the College spot for free. Leon returned to work at the spot and paid off some of his debt. On February 20, 1986, however, he was told to go to Mike's Candy Store. Scarpa was there and greeted him, but soon left. Granato gave Leon a quarter and told him he had fifteen minutes to raise $17,000. Granato said that Scarpa told him not to let Leon leave

the store until the money was paid. After a few minutes of taunts from Crew members, he was beaten with a baseball bat and required hospitalization for a broken arm and other injuries.

Testimony of the cooperating witnesses was corroborated by testimony of police officers who had observed and arrested Crew workers at the College spot, as well as by evidence connecting Scarpa with the co-defendants. Videotapes and photographs showed Scarpa wearing a beeper and talking with various co-defendants outside the Wimpy Boys Club. The government also established that Scarpa had substantial income from an illicit source, although Scarpa contends that the source was gambling, not drugs.

The jury also heard tape recordings made by a government agent of conversations with DeCarlo, who had pleaded guilty to bribery in violation of N.Y. Penal Law § 200.00 (McKinney 1988). DeCarlo said on the tapes that he reported to Gregory Scarpa, and that his "bosses" were aware of the payments.

On appeal, Scarpa does not challenge the evidence of illegal activities on the part of his co-defendants, who have appealed their convictions separately. Rather, he asserts that two evidentiary rulings were erroneous. These rulings involved statements he made following his arrest, and tape recordings made of conversations inside the Wimpy Boys Club.

Scarpa further contends that the evidence against him was too weak for the asserted evidentiary errors to be deemed harmless, and that they therefore require reversal of his conviction and a new trial. We find, however, no error in the challenged evidentiary rulings, and therefore do not reach the question of harmless error. We note that Scarpa makes no claim that, absent error in the evidentiary rulings, the evidence was insufficient to support his conviction.

### 1. *Scarpa's Statements to Agent Gilbride*

Scarpa was arrested by agents of the Drug Enforcement Administration at a motel in Lakewood, New Jersey, at approximately 2:00 a.m. on August 29, 1988, after 45 minutes of negotiations during which Scarpa refused to leave his room. Upon arrest, DEA Special Agent John Gilbride advised Scarpa of his *Miranda* rights, but Scarpa interrupted him stating: "I understand my rights, you don't have to go on." Despite Scarpa's statement, Gilbride completed the advice of rights, and then asked Scarpa if he understood those rights. Scarpa said he did.

Gilbride put on a hat, pointed to the logo from the television show "America's Most Wanted," and asked if Scarpa had seen the show. Scarpa, who had been profiled on the show, laughed and said he had seen the show. Gilbride testified that, when asked if he had an attorney, Scarpa "stated that he didn't have a lawyer, that he was going to get a lawyer. But he didn't know the guy's name." Gilbride inquired further and asked Scarpa if he knew the lawyer's name. Scarpa replied that he "didn't know the guy's name but he's the guy that defended Billy Meli when he bit the cop's ear off." Gilbride testified that he did not ask Scarpa if he wanted to waive his right to remain silent, because he did not intend to interrogate him. At 3:00 a.m. Scarpa was taken to the Lakewood Township Jail, and there was no further conversation with Gilbride at that time.

The next morning, Gilbride and a Deputy United States Marshal took Scarpa to the federal courthouse in Camden, New Jersey. Sometime before or during the trip to the courthouse, Joseph Benfante, a lawyer who had been retained by Scarpa's family, telephoned the Assistant United States Attorney in charge of the Camden office and received assurances that Scarpa would not be questioned. Benfante and the AUSA discussed Scarpa's arraignment in New York and a stipulation waiving extradition proceedings. Benfante also spoke with the United States Marshal's offices in Camden and Trenton. He subsequently represented Scarpa at trial and on this appeal.

The car Gilbride was driving to Camden with Scarpa and the Marshal did not have a radio. Thus, neither Gilbride nor Scarpa

knew that Benfante had been retained by Scarpa's family or that he had contacted the United States Attorney's office. In what the district court found to be a "relaxed and friendly" conversation, Gilbride and Scarpa talked about Scarpa's life as a fugitive and the trial of his co-defendants during the two-hour ride to Camden. 701 F.Supp. at 380. Scarpa repeatedly asked Gilbride to reveal who gave him up, but he never asked for an attorney and never told Gilbride that he did not want to talk.

In the midst of this ongoing conversation, Scarpa made statements which he later sought to suppress in the district court.[1] When Gilbride commented that he did not think Scarpa would be a fugitive for this long, Scarpa said that he would have left New Jersey in three days had he not been caught. Scarpa said he had been in Florida but came to New Jersey because it was "too hot" in Florida.

Gilbride asked if Scarpa thought his friends were mad at him because "they had to [go to] trial, you didn't." Scarpa said no, "my friends aren't like that. They're good guys." In fact, Scarpa said, he was visited by Billy Meli, one of the eight co-defendants, when Meli was under house arrest. When Gilbride commented that it had been a long trial, Scarpa said that Nunzio DeCarlo, who had been taped in his conversations with Leon and police officers, "was his biggest problem because he talked too much." Although Scarpa had not heard the tapes, he said he had been told of their content and was kept informed during the trial by his father. Scarpa said that co-defendants Mario Parlagreco and Kevin Granato were "stand-up guy[s]."

### 2. *The Wimpy Boys Tapes*

The government introduced evidence that Scarpa and the co-defendants met regularly on the sidewalk outside the Wimpy Boys Club. The evidence included silent videotapes, still photographs and testimony by undercover officers who had conducted surveillance of the Club. The only evidence of activities inside the Club suggested that drugs never were discussed there. Gaeta testified that the one time he mentioned drugs in the Club, Scarpa walked away from him and Granato admonished him never to bring up the topic in the Club again. Leon also testified that he was told to stay away from the Club and never to bring drugs near Scarpa.

Prior to the trial of the co-defendants, the Brooklyn District Attorney's Office informed the government that it had conducted electronic surveillance in the Club over a four month period in 1986, and that it had tapes of conversations. The initial discussion between the government and the District Attorney's Office indicated that Scarpa's voice probably was on the tapes. The government examined the tapes and prepared an affidavit describing their contents. The affidavit was reviewed by the district court *in camera*, and the district court determined that the tapes contained no incriminating or exculpatory statements relevant to the co-defendants' case. Motions to discover the contents, therefore, were denied.

Scarpa also attempted to obtain the tapes at his trial, arguing that the absence of incriminating statements during the period in which he allegedly led the Crew was relevant to establish the absence of the activity alleged. The district court refused to order disclosure of the tapes, agreeing with the government that they contained conversations which were "either wholly innocuous or involve[d] criminality that has nothing to do with the crimes charged in this case."

### DISCUSSION

**I. Scarpa's Statements to Agent Gilbride**

■ The fifth amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Having been indicted, Scarpa was entitled also to

---

**1.** Since the district court was faced with an *in limine* motion to suppress, it addressed all statements made by Scarpa to Gilbride. Our review is limited to only those statements actually presented to the jury.

the sixth amendment right "to have the Assistance of Counsel for his defence," *id.* amend. VI, which includes the right to have counsel present at any postindictment interrogation by the government. *Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985); *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). Such rights can be waived, with the burden on the government to prove by a preponderance of evidence that any waiver was knowing and intelligent. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *see Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *United States v. Burger*, 739 F.2d 805, 809 (2d Cir.1984). This standard for finding a waiver is the same under the fifth and sixth amendments. *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988).

The district court found that Scarpa "knowingly and voluntarily waived those rights and that the government proved that beyond a reasonable doubt." 701 F.Supp. at 381. The district court found also that Scarpa had not requested counsel when he stated that he "was going to get a lawyer." *Id.* at 381–82. The factual findings underlying these determinations will not be reversed unless clearly erroneous. *United States v. Isom*, 588 F.2d 858, 862 (2d Cir. 1978); *United States v. Friedman*, 558 F.2d 1125, 1127 (2d Cir.1977) (per curiam).

■ When considering whether a defendant waived his constitutional rights, we consider all relevant circumstances, employing a presumption that the defendant did not waive his rights. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757. Scarpa does not challenge the fact that he was informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Upon his arrest, Scarpa expressed an understanding of his rights, indeed interrupted the agent who advised him of his rights, to indicate both his familiarity with them and his determination to make his own decisions. *See Isom*, 588 F.2d at 862. The questioning occurred during a two-hour car ride found to be "relaxed and friendly." This followed an overnight detention of approximately six hours. There are no allegations of any physical or psychological deprivations. *See United States v. Guarno*, 819 F.2d 28, 30 (2d Cir.1987). Thus, there is no suggestion of "intimidation, coercion or deception." *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).

Viewing the "totality of the circumstances," we find that Scarpa waived his constitutional rights with "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* While merely answering questions after *Miranda* warnings have been given does not necessarily constitute a waiver, no express statement of waiver is required. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757; *United States v. Rubio*, 709 F.2d 146, 152 (2d Cir.1983); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). " '[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.' " *Rubio*, 709 F.2d at 152–53 (quoting *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757).

Scarpa consistently chose to confront law enforcement officers without assistance. During the eight months that he remained a fugitive, he knew of the outstanding indictment against him and followed the progress of the trial of his co-defendants. This is evident not only from his statements, but also from the fact that at the time of his arrest he had in his possession three telephone numbers for the attorney representing one of his co-defendants. At no time, however, did he attempt to obtain counsel for himself. *Compare Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir.1988) (defendant knew he was a suspect for two days prior to his arrest but did not obtain counsel) *with Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (defendant's "consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right"). When Scarpa was arrested by DEA agents, he negotiated

with the agents for 45 minutes while he remained in the motel room with his wife and child. Again, he made no effort to contact an attorney or to have his wife contact an attorney in his behalf. *Compare Burbine*, 475 U.S. at 418, 106 S.Ct. at 1139 (defendant "was left in a room where he had access to a telephone, which he apparently declined to use") *and Terry*, 862 F.2d at 412 (defendant had opportunity to ask mother to obtain attorney in his behalf) *with United States v. Lilla*, 534 F.Supp. 1247, 1279 (N.D.N.Y.1982) (defendant "specifically exercised his right to counsel by requesting his mother to reach his attorney by telephone"), *aff'd in part and rev'd in part on other grounds*, 699 F.2d 99 (2d Cir.1983). Scarpa's step-mother retained Benfante on her own initiative and without his knowledge.

Scarpa was not a tyro in these matters. He had previously worked with lawyers, retaining several to represent his minions in the marijuana operation. *See Isom*, 588 F.2d at 862 (finding of waiver not clearly erroneous when "appellant expressed his understanding of his rights as they were read to him, signed the waiver of rights form, and had had rather considerable prior experience with law enforcement officers"); *Boston*, 508 F.2d at 1175 (finding of waiver not clearly erroneous despite defendant's "refusal to execute a written waiver"). The reasons he spoke with Gilbride are clear. He was confident in his own ability to deal with law enforcement officers and he thought he could persuade Gilbride to reveal who had given him up.

■ Having waived his constitutional rights, those rights could not be invoked by a third party or even by an attorney retained by a third party without Scarpa's knowledge. In *Burbine*, the Supreme Court held that the privilege against self-incrimination is personal to the defendant. 475 U.S. at 433 n. 4, 106 S.Ct. at 1147 n. 4. Thus, a waiver of constitutional rights is valid even though the defendant is not informed that an attorney retained without his knowledge by a third person has asked that the defendant not be questioned. *Id.* at 417, 106 S.Ct. at 1138 (defendant ques-

tioned less than one hour after government promised otherwise to attorney retained by defendant's sister). "Events occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. at 1141. *Miranda* warnings are sufficient to "let [the defendant] know what a lawyer could 'do for him' during the postindictment questioning: namely advise [the defendant] to refrain from making any such statements." *Patterson*, 108 S.Ct. at 2395; *accord Terry*, 862 F.2d at 412.

Both *Patterson* and *Burbine* suggest that, when the sixth amendment attaches, "the police may not interfere with the efforts of a defendant's attorney to act as a ' "medium" between [the suspect] and the State' during the interrogation." *Burbine*, 475 U.S. at 428, 106 S.Ct. at 1144 (quoting *Moulton*, 474 U.S. at 176, 106 S.Ct. at 487); *see also Patterson*, 108 S.Ct. at 2397 n. 9 (waiver may be invalid in sixth amendment context "where a suspect was not told that his lawyer was trying to reach him during questioning"). Certainly, when a defendant has retained, or even expressed a desire for, counsel the state has "an affirmative obligation to respect and preserve the accused's choice to seek this assistance." *Moulton*, 474 U.S. at 171, 106 S.Ct. at 484. It also is established that a defendant does not have to request an attorney in order to be entitled to one. *Williams*, 430 U.S. at 404, 97 S.Ct. at 1242. But it does not follow under either the fifth or sixth amendments that an attorney unknown to the defendant may invoke the defendant's rights and thereby prevent the defendant from waiving them.

When a defendant requests an attorney, it " 'indicates he does not believe that he is sufficiently capable of dealing with his adversaries single-handedly.' " *United States v. Gotay*, 844 F.2d 971, 976 (2d Cir.1988) (quoting *Michigan v. Jackson*, 475 U.S. 625, 634 n. 7, 106 S.Ct. 1404, 1410 n. 7, 89 L.Ed.2d 631 (1986) (citation omitted)); *see also Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). In the sixth amend-

ment context, such a request is construed broadly to include "every critical stage of the prosecution." *Jackson,* 475 U.S. at 633, 106 S.Ct. at 1409. Scarpa did not *request* counsel when he stated that he would get a lawyer, nor is there any other indication that he doubted his ability to deal with the government agents on his own. Scarpa's confidence, familiarity with the law and determination are in no way analogous to the equivocal statements in *Gotay,* where the defendant said that "she couldn't afford a lawyer [and] that she was concerned about obtaining a lawyer." 844 F.2d at 976. Scarpa knew how to get a lawyer and he knew that he wanted one at a later time, after he attempted to get information out of Gilbride. His mention of the word lawyer did not automatically mean that Gilbride had to cease all inquiry. *See Gotay,* 844 F.2d at 975 (rejecting approach that questioning must cease "as soon as the word or concept 'lawyer' is mentioned").

Significantly, while this court held in *Gotay* that interrogation must cease "when a suspect makes an equivocal statement that arguably can be construed as a *request* for counsel," we determined that the defendant's initial refusal to speak in the presence of a co-defendant was not a request for counsel and did not bar an interrogation following that refusal. *Id.* at 975 (emphasis added). The circumstances in *Gotay* indicated that the defendant was afraid to speak in front of her co-defendant.

Here, the circumstances reveal a self-confident defendant who knew whether and when he wanted an attorney. We conclude that the district court, "supported by his evaluation of the actions and words of the accused," *Rubio,* 709 F.2d at 153, properly determined that Scarpa waived his rights to counsel and to remain silent, and that he did not request an attorney.

II.  The Wimpy Boys Tapes

■ Rule 16 of the Federal Rules of Criminal Procedure requires disclosure by the government of "any relevant written or recorded statements made by the defendant ... within the possession, custody or

control of the government." Fed.R. Crim.P. 16(a)(1)(A). " '[D]eterminations of relevance are entrusted to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally.' " *United States v. Diaz,* 878 F.2d 608, 614 (2d Cir.1989) (quoting *United States v. Cruz,* 797 F.2d 90, 95 (2d Cir.1986)), *cert. denied,* — U.S. —, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).

Scarpa contends that the absence of incriminating statements on the tapes is relevant in the sense that it tends to disprove the government's theory that the defendants congregated at the Wimpy Boys Club to discuss the marijuana business. Scarpa contends also that the tapes would support his contention that his illicit income came from gambling, rather than from drugs.

■ A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions. *See United States v. O'Connor,* 580 F.2d 38, 43 (2d Cir.1978); *United States v. Shapiro,* 159 F.2d 890, 891 (2d Cir.1947), *aff'd,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *see also* 1A Wigmore on Evidence § 56.1 (Tillers rev. 1983). The district court found that the tapes contained conversations which were "either wholly innocuous or involve[d] criminality that has nothing to do with the crimes charged in this case." The absence of drug conversations is consistent with testimony by the cooperating witnesses that drugs were never discussed inside the Club. Thus, the district court appropriately refused to order disclosure of the tapes. *See United States v. McElroy,* 697 F.2d 459, 464 (2d Cir.1982) ("Rule 16 thus does not cover oral statements unrelated to the crime charged or completely separate from the Government's trial evidence.").

CONCLUSION

The judgment of the district court is affirmed.