**UNITED STATES of America**

v.

**Clarence HEATLEY, et al., Defendants.**

**No. 96 Cr. 515(SS).**

United States District Court,
S.D. New York.

Oct. 28, 1998.

Alan S. Futerfas, Joel S. Cohen, New York City, David A. Ruhnke, Montclair, NJ, for Defendant Clarence Heatley.

Mary Jo White, United States Attorney, Southern District of New York, New York City, Sharon L. McCarthy, Andrew S. Dember, Assistant United States Attorneys, for the United States.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendant Clarence Heatley moves this Court, pursuant to Fed.R.Crim.P. 12(b)(3), to suppress statements made by him immediately following his arrest on the ground that the statements were obtained in violation of his Fifth and Sixth Amendment rights. Heatley also moves for suppression of all fruits of the statements. For the reasons to be discussed, the Court denies Heatley's motion.

### BACKGROUND

The following constitute the Court's findings of fact, as shown by a preponderance of

the evidence. Defendant Clarence Heatley was first indicted on July 15, 1996, on three counts of murder in aid of racketeering activity in violation of 18 U.S.C. § 1959. On August 12, 1996, several members of the Joint Organized Crime Task Force of the Federal Bureau of Investigation and the New York City Police Department set out to various New York locations for the purpose of arresting Heatley and his codefendant John Cuff. Among these officers were NYPD Detectives Warren Norman and Tony Ortiz, who at approximately 3 p.m. traveled to a location on Grand Concourse in the Bronx, whereupon they saw Heatley on the street.

After observing Heatley make a call from a pay phone, Norman and Ortiz drove up next to him and got out of their car. Norman identified himself as NYPD, asked Heatley's name, and placed Heatley under arrest. Heatley asked why he was being arrested, but Norman explained that he was not the lead officer in the case and that it would be explained later. Although Heatley claims, in an affidavit submitted to this Court in support of his motion, that he asked to use the phone near the arrest to call his attorney,[1] Norman testified that no such request was made, and the Court credits Norman's testimony. Norman cuffed Heatley, placed him in the backseat of the car, and Norman also got in the backseat while Ortiz proceeded to drive to the NYPD 32d Precinct in Harlem. During the ride—although again, Heatley's affidavit disputes this—the Court finds that Norman read Heatley each of his *Miranda* rights and that Heatley indicated that he understood them. No other conversations took place en route to the precinct.

Upon arrival at the precinct, Heatley was placed in a holding cell, where he remained for approximately an hour. Heatley's codefendant, John Cuff, who had been arrested separately by FBI Special Agent Neil Donovan, was placed in the holding cell with Heatley. NYPD Detective Vincent Flynn, also a member of the Joint Task Force and one of the detectives responsible for coordinating the arrests, heard that Heatley and Cuff had been taken into custody and went to the 32d

Precinct. Although Heatley claims he asked for an attorney at the precinct, Detectives Flynn and Norman and Agent Donovan all remained near the holding cell in the 32d Precinct, while Flynn talked to Heatley directly; each officer testified that he heard no such request. The Court finds that no such request was made.

At approximately 5 p.m., Agent Donovan and FBI Agent Edward Farmer drove Heatley to the FBI offices at 26 Federal Plaza. Cuff was also taken, separately, to 26 Federal Plaza. During the ride, Heatley asked the agents about the charges against him, and Donovan informed him that they involved racketeering and murder, but that Donovan did not know the specifics. Heatley also asked about the potential penalties he faced, to which Donovan again replied that he did not know the specifics, but that penalties for the charges he faced generally ranged up to life imprisonment. At no time during the ride did Heatley ask for an attorney, nor did he make any statements other than the questions noted.

Upon arrival at 26 Federal Plaza, Heatley was taken to an interview room on the 22d floor. One of Heatley's hands was cuffed to a metal bar attached to the wall, thus restraining him but leaving one hand free to write. Heatley was offered food and drink, and then Donovan began taking "pedigree" information—name, address, etc. Also present in the interview room was Detective Norman, who wanted to witness the FBI interview procedures but was not otherwise involved in the questioning.

FBI Special Agent David Higgins, another member of the Joint Task Force, was in his office on the 22d Floor of 26 Federal Plaza when he heard that Heatley had been brought into the interview room. Higgins entered the interview room, where Agent Donovan was taking pedigree information and creating an inventory of Heatley's personal effects. Higgins began to talk to Heatley about some of Heatley's past record, specifically an arrest of Heatley in Virginia, in order, according to Higgins, to let Heatley

---

1. Heatley did not testify at the suppression hearing, but did submit an affidavit in support of his

motion which formed the basis for the Court's granting of an evidentiary hearing.

know that Higgins was familiar with his background.

After the pedigree information was complete, Higgins asked Heatley about his educational level and, ascertaining that Heatley could read the waiver of rights form, proceeded to hand Heatley the form. Higgins initially filled out the form at 5:45 p.m. Apparently while Heatley had the form, but before he read it, Higgins began a preliminary discussion of cooperation with Heatley:

> I advised him that if he was willing to acknowledge the fact that I was advising him of his rights in a formal fashion and to waive those rights, that I would spend some additional time in explaining what I felt were his options in his best interest in potential cooperation with the government. I indicated to him that if he would waive his rights and he would listen at some length to me and then make a decision about whether or not he wanted to make a statement or not at that time, that I would spend this time with him. And I pointed out to him, after he read the rights, particularly the aspects about there was no need for him to make any statement after he signed this waiver, that he could simply hear me out, take the entire matter under consideration and not talk to us at all.

> I explained to him that often times the government seeks to develop cooperating witnesses in an investigation of this type and that an initial interview with the agents and detectives can often set the tone of future cooperation to both the prosecutor's office and, through that office, to the Court should he eventually face any

sentencing in connection with the crimes alleged against him.

Hearing Tr., at 136–37. Higgins described the preliminary discussion of cooperation as "perfunctory" and indicated that he did not like to get into a great amount of detail with suspects about cooperation. He did, however, describe cases where defendants charged with crimes of similar magnitude to Heatley's had received relatively light sentences. Higgins also pointed out to Heatley the fact that Cuff was also in custody and that there could be "a certain urgency" in that Cuff or other co-defendants might be cooperating with the government. Higgins did not say, however, that Cuff was in fact cooperating.

From Higgins' testimony, the Court finds that he did condition further discussion of how cooperation works upon Heatley's signing of the waiver form. However, while Higgins discussed the possible benefits of cooperation in hopes of persuading Heatley to talk, and told Heatley that if Heatley spoke with the agents honestly it would "set the tone" for future cooperation and that this fact would be relayed to the United States attorneys, at no time did Higgins promise Heatley a cooperation agreement if he talked with the agents.[2] Higgins also told Heatley that even should he waive his rights, he could still decide at any time to stop talking with the agents. Moreover, although Heatley claims otherwise in his affidavit, the Court finds that at no time did the agents tell Heatley that if he refused to waive his rights and talk to them he would be denied the possibility of a cooperation agreement.

---

2. During cross-examination, Detective Flynn did testify as follows:
> Q: And you told him [Heatley] that they [the U.S. Attorney's office] would take that information and they would assess that information so you better be truthful with us. Did you say something like that in words or substance?
> A: Basically, I told him that all he would be ever asked to do is be truthful.
> Q: And that if he was truthful he would get a cooperation agreement and he could get a chance for a reduced sentence. Is that basically what was implied to him or told to him expressly?
> A: Yes.

Tr. at 127. This testimony suggests that in fact Heatley was promised a cooperation agreement

if he agreed to speak truthfully with the agents. However, on redirect Flynn specifically denied this fact:
> Q: Detective Flynn, did you promise Mr. Heatley a cooperation agreement if he spoke to you after his arrest?
> A: No, I did not.

Tr. at 128. The Court finds that, taken in context, the testimony on cross was intended to reflect that Flynn told Heatley that, if the Government decided to allow Heatley to cooperate, all that would be required of him would be truthfulness. I credit Flynn's unequivocal denial on redirect, and find that no promise of a cooperation agreement was made.

After the preliminary discussion of cooperation, Heatley read the waiver form, outlining each of his *Miranda* rights, out loud.[3] Higgins asked Heatley if he understood his rights, Heatley indicated he did, and at 5:55 p.m. Heatley signed the waiver form. Higgins then talked further with Heatley about cooperation, explaining in greater detail how 5K.1 letters work, for example. Higgins and Detective Flynn then began a conversation with Heatley about certain crimes of which Heatley had knowledge. Heatley made his statements freely and never refused to answer questions until the end of the session, when Heatley, knowing that John Cuff was being taken back to prison, asked that he not be separated from Cuff for too long lest Cuff believe Heatley was cooperating. Heatley spoke with the officers for approximately three hours.

Although the Heatley affidavit disputes this, the Court finds that at no time during the interview at 26 Federal Plaza did he indicate that he wanted an attorney or request to use the phone to call an attorney. In addition, although Heatley claims that he had an arrangement with the NYPD that anytime the police wanted him they would contact his lawyer rather than arrest him, the Court finds that, even if Heatley had such an arrangement with a particular NYPD officer, none of the officers involved in the arrest, transport, or questioning of Heatley had any knowledge of such an agreement.

### DISCUSSION

#### I. *Heatley's Rights Under The Fifth and Sixth Amendment*

The Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to safeguard this right against compulsory self-incrimination, and presuming that custodial interrogation is "inherently coercive," *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984), the Supreme Court craft-

ed the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), dealing with police interrogation of a person in custody: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612.

■ Once a suspect in custody invokes his right to counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1627). Once an accused invokes his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884–85. An accused may, however, volunteer statements, even after an invocation of the right to counsel, as these statements are not the product of "interrogation" and therefore no Fifth Amendment right is implicated. *See id.* at 485–86, 101 S.Ct. at 1885.

■ When the government seeks to introduce a statement made by a suspect during a custodial interrogation, the government bears the burden of proving, by a preponderance of the evidence, that the suspect validly waived his *Miranda* rights and that the statement "was 'truly the product of free choice.'" *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.1996) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)). A statement is not voluntary if the product of "circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991). This determination may only be made "after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of in-

---

**3.** In his affidavit, Heatley states that he did not have his reading glasses and thus could not read the waiver of rights form. Agent Higgins agreed that Heatley did not have on his glasses, but that

Heatley nevertheless read the form. The Court credits Higgins's testimony and finds that Heatley read the form.

terrogation, and the conduct of law enforcement officials." *Id.*

■ The Sixth Amendment right to counsel attaches "at the 'initiation of adversary judicial proceedings.'" *United States v. Abdi,* 142 F.3d 566, 569 (2d Cir.1998) (quoting *United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984)). The initiation of adversary proceedings is indicated by, *inter alia,* indictment. *See Patterson v. Illinois,* 487 U.S. 285, 290, 108 S.Ct. 2389, 2393, 101 L.Ed.2d 261 (1988); *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *United States v. Birbal,* 113 F.3d 342, 345 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 433, 139 L.Ed.2d 333 (1997). The right to counsel applies to all "critical stages" of the adversary proceedings, of which interrogation is one. *See Patterson,* 487 U.S. at 290, 108 S.Ct. at 2393; *Michigan v. Jackson,* 475 U.S. 625, 629–30, 106 S.Ct. 1404, 1407–08, 89 L.Ed.2d 631 (1986). Once the right to counsel attaches, "the Sixth Amendment renders inadmissible in the government's case-in-chief, statements elicited by the government outside the presence of defendant's counsel that are not accompanied by a waiver of this right." *Abdi,* 142 F.3d at 569.

As with the Fifth Amendment, it is the government's burden to show that any waiver was a "voluntary, knowing, and intelligent relinquishment," *Michigan v. Harvey,* 494 U.S. 344, 348–49, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990); *see Patterson,* 487 U.S. at 292–93, 108 S.Ct. at 2394–95; and this determination must be made " 'upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.' " *Jenkins v. Leonardo,* 991 F.2d 1033, 1037–38 (2d Cir. 1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *see also United States v. Scarpa,* 897 F.2d 63, 68 (2d Cir.1990) (standard for waiver under Fifth and Sixth Amendment is identical).

■ In addition, however, under the prophylactic rule announced in *Jackson,* once a defendant invokes his Sixth Amendment right to counsel in a government-initiated interrogation, "any subsequent waiver of that right is presumed invalid, even if the waiver is knowing and voluntary." *Abdi,* 142 F.3d at 569; *see Jackson,* 475 U.S. at 629–32, 106 S.Ct. at 1407–09. Statements elicited in violation of this rule are inadmissible in the prosecution's case-in-chief, although may be admissible for impeachment purposes if voluntary and accompanied by a knowing, voluntary, and intelligent waiver of the right to counsel. *See Abdi,* 142 F.3d at 569–70.

## II. *The Validity of Heatley's Waiver and Statements*

There is no dispute that, at all times relevant here, Heatley was in custody as defined by *Miranda.* Furthermore, as Heatley had been indicted prior to his arrest, judicial adversary proceedings had begun and therefore his Sixth Amendment right to counsel also had attached. Heatley was therefore entitled, first, to the *Miranda* warnings. As noted above, the Court declines to accept the version of events in Heatley's affidavit and instead credits Detective Norman's testimony that he read Heatley his *Miranda* rights during the transport to the 32d Precinct. Moreover, the Court finds Agent Higgins informed Heatley of his rights again at 26 Federal Plaza when he presented him with the waiver of rights form and asked him to read it out loud. As for Heatley's Fifth and Sixth Amendment right to counsel, as noted, the Court finds that Heatley never asked to speak to an attorney and thus his right to counsel was never invoked. Therefore, the prophylactic rule of *Edwards* and *Jackson*—invalidating any waiver of the right to counsel obtained as a result of police-initiated contact—is not applicable.

■ The sole question in this motion, then, is whether, in light of "the totality of all the surrounding circumstances," *Bye,* 919 F.2d at 9 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)), Heatley's waiver of his Fifth and Sixth Amendment rights[4]

4. Although presumably the waiver signed by Heatley was a waiver of his *Miranda* (i.e., Fifth

Amendment) rights, a valid waiver of Fifth Amendment rights, following proper *Miranda*

was voluntary, knowing and intelligent and his statements made thereafter were also voluntary. In making this determination, the Second Circuit has directed the courts to examine essentially three factors: "[the defendant's] background and experience, the conditions of his interrogation and the conduct of the law enforcement officers." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir.1995); *see also Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047 (circumstances supporting involuntariness include "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep.").

As for the first factor, there is nothing in the record to suggest that Heatley was naive in the ways of the criminal justice system or in any way unusually vulnerable. Heatley is not a youth. Testimony at trial indicated that Heatley had been brought to trial on state criminal charges at least twice prior to his arrest in this case, possibly more. Moreover, Heatley had at one point in 1986 walked into the 32d Precinct and talked with the chief detective about his concerns over ongoing investigations of Heatley's activities, suggesting at least more than a passing familiarity with police tactics.

Second, the conditions of Heatley's interrogation were not particularly onerous. Although Heatley suggested he was deprived of food and an opportunity to use the bathroom until he waived his rights, as indicated earlier the Court finds the testimony of Agent Donovan credible that Heatley was offered food and drink immediately upon being taken to the interview room. Heatley was not subjected to lengthy or haranguing interrogation prior to or after his signing of the waiver. The entire length of the session was no more than about three hours. Nothing in the manner of the arrest, his stay at the 32d Precinct, or his transport suggests overbearing conditions. This is not to suggest that his

arrest and interrogation were pleasant, stress-free experiences, but they were no more coercive than what is inherent in any custodial interrogation, and it is precisely this inherent coerciveness that the Supreme Court has determined *Miranda* warnings are sufficient to dispel.

██ Finally, there is the conduct of the officers. To begin with, there is no dispute that Agent Higgins, and possibly Detective Flynn, described to Heatley both the possibility and benefits of cooperation and did so with the hopes of enticing Heatley to waive his rights and talk. Merely describing the benefits of cooperation, however, without more, does not render a subsequent waiver involuntary. *See Ruggles*, 70 F.3d at 265; *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995); *United States v. Bye*, 919 F.2d 6, 8–10 (2d Cir.1990). The agents did not lie to Heatley, *see Ruggles*, 70 F.3d at 265 ("Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will"); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987) (misrepresenting quantity of evidence against defendant may render confession suspect); nor, as the Court has found, did they falsely tell Heatley that his failure to speak to them would preclude the possibility of a cooperation agreement, *see Anderson*, 929 F.2d at 100.

Nor is there any problem with Higgins' pointing out of the fact that there might be "a certain urgency" in that John Cuff was in custody and that he might be cooperating against Heatley. Higgins never said that Cuff was actually cooperating, only that it was possible, so there was no false statement made. Heatley knew, moreover, of Cuff's arrest because they were in the holding cell together at the 32d Precinct. Heatley had to have known that the same opportunity for cooperation being urged upon him would likely be available to Cuff, so Higgins was doing little more than making a factual observation, albeit one intended to encourage Heatley to speak.

warnings, serves also to waive the Sixth Amendment right to have counsel present during the interrogation. *See Patterson*, 487 U.S. at 292–97, 108 S.Ct. at 2394–97; *United States v. Charria*,

919 F.2d 842, 846–48 (2d Cir.1990); *United States v. Felipe*, No. 94 CR 395, 1996 WL 328746, at *1, 1996 U.S. Dist. Lexis 8302, at *4–6 (S.D.N.Y.1996).

The only troubling aspect of Agent Higgins' conduct was the fact that he spoke briefly to Heatley about cooperation then conditioned further explanation of cooperation upon Heatley's signing of the waiver form. Heatley argues, in effect, that this conduct was tantamount to a statement by Higgins that failure to waive his rights would preclude the possibility of future cooperation, a tactic which would, presumably, be impermissibly coercive under *Anderson.* However, the Court finds that this statement does not rise to quite that level; rather, the most that Higgins' statement could be taken to mean is that Higgins had information about cooperation to which Heatley could not be privy if he failed to waive his rights.

Under some circumstances—for example, if the suspect to whom this statement was made were completely unfamiliar with the criminal justice system, the adversarial role of the police and the role of defense counsel—such a statement could lead a suspect (incorrectly) to believe that he or she was faced with the Hobson's choice of waiving his or her rights or forever closing off access to vital information about cooperation. Such is not the case here, however. As noted, Heatley is no stranger to the criminal justice system, having been through at least two trials.

Heatley relies heavily on the following passage from *Anderson* :

> We look first at defendant's background. He had been arrested 12 times previously and on 11 occasions pled guilty to the crime charged. The government believes this experienced criminal background proves his statements were freely given. We disagree. Nothing in the record reveals that on the prior occasions Anderson was given *Miranda* warnings or that he waived his rights, or in fact made any statements to the police. His background suggests familiarity with the criminal justice system generally; it does not intimate any knowledge of the rules regarding the benefits of cooperating with the government in federal court. *See* United States Sentencing Guidelines (Guidelines)

§ 5K1.1. Thus, this accused's background does not support the government's notion that Anderson's confession was voluntarily given.

*Anderson,* 929 F.2d at 99. It is true that a similar situation obtains here: there is no evidence that Heatley was familiar with the Sentencing Guidelines or the procedures and laws regarding cooperation. That is not the pertinent familiarity, however. In *Anderson,* the defendant had been told, falsely, that his failure to waive his rights would forever preclude cooperation; thus, the fact that he did not know how cooperation worked (or, more accurately, that the government failed to prove he knew) was highly relevant. In the instant case, however, the more pertinent question is, did Heatley understand enough about the criminal justice system to know that information about cooperation was not solely obtainable from Agent Higgins?

Certainly, whatever Heatley's knowledge of the intricacies of cooperation, it is impossible to believe that Heatley thought the best information and advice on how (and whether) to cooperate was available only from Agent Higgins, rather than from a defense attorney. Heatley's past experience is highly relevant on this point. He had faced trials on criminal charges at least twice before and had retained counsel on both, so he certainly knew that the job of providing accurate legal information and advice with his best interest in mind belonged to defense counsel, not the law enforcement officers who had arrested and were interrogating him. Moreover, the *Miranda* warnings would put all but the most naive suspect on notice that the agents questioning him were adversaries—this is, in fact, one of their purposes. *See Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625 (warning given by police that anything said can and will be used against individual "may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.").

Under the totality of the circumstances in this case, Higgins' statements were not improperly coercive.[5] The statements, and the

---

5. The Court does not intend to suggest that the

Higgins approach to withholding information

entire interrogation, did not "overbear [Heatley's] will." *Anderson,* 929 F.2d at 99. The Court finds that the government has sustained its burden of proving that Heatley's waiver of his rights was voluntary, knowing, and intelligent, and that all statements made thereafter were also voluntary. The Court therefore denies the motion to suppress.

### CONCLUSION

For the foregoing reasons, the Court denies Heatley's motion to suppress his post-arrest statement and any fruits thereof.

**SO ORDERED.**

about cooperation until the waiver is attained is commendable. The situation is fraught with the danger that, in other circumstances, such an approach could be unduly coercive. The Court is holding only that, in the circumstances of this case, it was not.